[Crim. No. 22045. May 6, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
RALPH A. DIEDRICH et al., Defendants and Appellants.

264

---

---

**COUNSEL**

Monroe & Riddet and Keith C. Monroe for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Richard D. Garske and J. Richard Haden, Deputy Attorneys General, Cecil Hicks, District Attorney, and Michael R. Capizzi, Assistant District Attorney, for Plaintiff and Respondent.

---

**OPINION**

**KAUS, J.**—Ralph Diedrich, a former member of the Orange County Board of Supervisors, appeals from a conviction of two counts of bribery (Pen. Code, § 165), and one count of conspiracy to commit bribery (Pen. Code, § 182, subd. 1). Leroy Rose appeals from a conviction on the conspiracy count.

I

FACTS—OUTLINE

In 1970, the Grant Corporation (Grant) acquired a 4,200-acre parcel known as Anaheim Hills, and formed Anaheim Hills Incorporated (AHI) to develop the land. About half of this parcel was the subject of an agricultural preserve agreement, negotiated by the previous owner under the Williamson Act. (Gov. Code, § 51200 et seq.; see generally

*Sierra Club* v. *City of Hayward* (1981) 28 Cal.3d 840, 850-853 [171 Cal.Rptr. 619, 623 P.2d 180].) Under that act landowners can enter into agreements with local governments, which, in exchange for substantial tax benefits, limit the use of the land to agricultural purposes. The agreements last a minimum of 10 years, but can be cancelled if approved by the governmental body having jurisdiction—in this case the Orange County Board of Supervisors. When Grant purchased Anaheim Hills, the agricultural preserve agreement had seven more years to run. The corporation's management wanted to remove the land from the preserve and build on it as soon as possible because the land was highly leveraged; interest payments alone totaled about $7,000 a day.

Ralph Diedrich was elected to the Orange County Board of Supervisors in November 1972. Shortly after his election he met with Richard Owen, president of Grant.[1] Owen explained his company's desire to remove the land from the preserve and sought Diedrich's help. About the same time, Leroy Rose requested a luncheon meeting with William Stark, president of AHI. Rose was an architect/land planner, Diedrich's personal friend and his campaign finance chairman. Rose and Stark discussed the possibility of meeting with Diedrich, and Rose mentioned that he was interested in selling a piece of property in Fullerton to AHI.

On January 16, 1973, Diedrich and Rose met with Owen and Stark, toured Anaheim Hills, and dined at the Jolly Fox Restaurant. During dinner, Owen explained the merits of removing his company's parcel from the agricultural preserve, and Rose attempted to sell the Fullerton land to Owen. Owen testified that one of the defendants suggested that if Owen purchased the Fullerton land, "it would materially help . . . getting Anaheim Hills out of the agricultural preserve." Diedrich or Rose acknowledged that the price of the Fullerton land was about $150,000 over market, but suggested that AHI could break even by building on the property. According to Owen, Stark left the table exclaiming, "This is getting too heavy for me." Neither Grant nor AHI bought the Fullerton property.

During the same month, Owen had additional conversations with Diedrich. Diedrich recommended that AHI hire Michael Remington, Diedrich's own attorney, to handle its agricultural preserve problems. Diedrich told Remington that he was referring a very good client with a

---

[1]Owen testified at the trial under a grant of immunity.

case of the "$100,000 variety." Diedrich also instructed Remington to handle the case outside of his regular law practice—assertedly because Remington's partner was on the City Council of Orange. Owen and Remington agreed on a fee of about $100,000: a $50,000 retainer, the balance to be billed in monthly installments not to exceed $15,000.[2] Remington personally picked up the $50,000 retainer and deposited it in two newly opened bank accounts. In March 1973, he received two more checks totaling $24,480, which were deposited into one of the accounts.

On March 2, 1973, at Diedrich's request, Remington wrote a $10,000 check on one of the new accounts to Ben Richman, who had asked Diedrich to invest in his sign business. In accordance with Diedrich's request, Remington negotiated and prepared a partnership agreement with Richman in his, Remington's, own name. Richman eventually returned the money to Remington because the agreement was unsatisfactory.

Two weeks later—and again at Diedrich's request—Remington prepared a $30,000 check to Bill Moore to repay a loan owed by Diedrich. Later, Remington also prepared a $25,000 check to Viking Mauna Loa Management Company, a company wholly owned by Diedrich. Diedrich personally picked up both checks.

Remington was ostensibly hired to assist in removing Anaheim Hills from the agricultural preserve. Nevertheless, for the $100,000 he was promised, the only documents he distributed to public bodies were a 17-page background report and accompanying resolution for the Anaheim City Council[3] and a 2-page memo for the Orange County Planning Department. Since the portion of AHI's land in the agricultural preserve was at this point completely within the jurisdiction of the Orange County Board of Supervisors, the resolution and report were

---

[2]The testimony indicates that there was little corporate separation between AHI and Grant, despite the fact that AHI was half owned by Texaco. Owen, president of Grant, hired Remington to represent AHI.

[3]A portion of Anaheim Hills was within the limits of the City of Anaheim. Another portion of the land was within Anaheim's "sphere of influence" and would eventually be incorporated within the city.

simply intended to encourage the Anaheim City Council to "urge the County Board of Supervisors to remove the land from the agricultural preserve." Neither Remington nor his employees ever appeared before a public body on behalf of AHI. Former State Senator Carpenter testified, based on his considerable experience as an attorney dealing with real estate transactions and the Williamson Act, that the fee paid to Remington was "way too high."

In May 1973, Grant cut off contact with Remington because Remington had encountered serious personal legal problems. Owen urgently instructed his new attorney to pick up the AHI file because he "didn't want anyone else to get hold of [it]." He testified that he was particularly concerned that the district attorney's office might see it. AHI voided a $27,909 check to Remington, the final payment for Remington's purported legal services. Despite serious financial difficulties, Remington never renewed his request for the money.

On March 6, 1974, the Orange County Board of Supervisors, by a three-to-two vote, agreed to remove Anaheim Hills from the agricultural preserve. The resolution and agreement approved by the board were not prepared by the county counsel as was customary, but furnished by Diedrich. As a condition of releasing the Anaheim Hills land from the agricultural preserve, the agreement required AHI to dedicate to the county a perpetual easement in gross on 954 acres of its land. However, 504 of these acres were not specified in the agreement; AHI retained the right to select these acres in the future—subject to the approval of the county board of supervisors.

About a month after the vote releasing Anaheim Hills from the preserve agreement, Diedrich called Owen and requested a $70,000 loan. Owen refused the loan because Grant was "a public corporation and ... it would not appear proper if we would loan a public official any money ...." He suggested, however, that Diedrich speak to a friend who was a vice president of Farmers and Merchants Bank. Owen also provided an appraiser, obtained a title report, and analyzed Diedrich's equity in certain collateral. Diedrich obtained an $80,000, 120-day loan from the bank.

From January 1973 through March 1974, Rose had called and written to AHI and Grant many times, requesting architectural and engineering contracts. On March 21, 1974, shortly after the vote releasing Anaheim Hills from the agricultural preserve, a representative of Grant

wrote to Rose explaining: "As I've indicated previously, all of our projects are commissioned and there are no new projects in the near future." Nevertheless, in June 1974, AHI's new president, Jack Sickler, hired Rose to develop a "conceptual plan" for the development of a portion of Anaheim Hills. The purpose of the project was ostensibly to demonstrate to the Anaheim City Council that a grading ordinance which it had proposed would "result in an unjustified loss of usable land and would not benefit the city." There was, however, evidence—to be analyzed later—that the project was largely fictitious.

From July through December 1974, AHI paid Rose about $95,000. During the same period, Rose gave $10,000 to Diedrich directly, and wrote checks to Remington totaling $40,000. Remington testified that he cashed these checks and gave most of the money to Diedrich. Of this sum $20,000 was paid to Diedrich on December 31, 1974. An additional $47,338 was paid to Rose from January to September 1975.

## THE INDICTMENT

Diedrich was indicted on two counts of bribery (Pen. Code, § 165) and one of conspiracy to commit bribery (Pen. Code, § 182, subd. 1) on December 15, 1977. Count I alleged that Diedrich wilfully and unlawfully received, offered to receive, and agreed to receive a bribe on or about the months of January 1973 through April 1973. Count II alleged that Diedrich received, offered to receive, and agreed to receive a bribe on or about December 31, 1974. Count III alleged that Diedrich and Rose entered into a conspiracy to violate section 165 of the Penal Code on or about September 3, 1975,[4] and for three years prior to that date. The jury found Diedrich guilty on all three counts, and Rose guilty of having participated in the conspiracy.

## II

### A. *Sufficiency of the Evidence—Count I*

Diedrich contends that the evidence on count I is insufficient to sustain a conviction. We disagree.

Penal Code section 165 states in relevant part: "Every person ... [on] any common council, board of supervisors, or board of trustees of

---

[4]This was the date on which the last payment from AHI to Rose was allegedly made.

any county, city and county, city, or public corporation ... who receives, or offers or agrees to receive any bribe[5] upon any understanding that his official vote, opinion, judgment, or action shall be influenced thereby, or shall be given in any particular manner or upon any particular side of any question or matter, upon which he may be required to act in his official capacity, is punishable by imprisonment ...."

Thus, as far as the bribe-taker is concerned, the crime of bribery consists of three elements: (1) the person charged must be a member of one of the bodies specified in section 165, (2) that person must ask for, receive, or agree to receive something of "value or advantage," present or prospective; and (3) the request, receipt or agreement to receive must be upon an understanding that his opinion, judgment or action upon any official matter on which he may be required to act will be influenced. With regard to count I, Diedrich contends generally that no "understanding" existed.

Count I covers the period from January to April 1973. During that time several events occurred that could form the basis of an understanding: Rose, in Diedrich's presence, offered to sell his land to AHI apparently in exchange for Diedrich's vote on the agricultural preserve; Diedrich suggested that AHI hire Remington apparently in exchange for Diedrich's favorable vote on terminating the preserve. The offer of the Fullerton land was refused, but the suggestion to hire Remington was accepted and he was paid over $74,000 of which $55,000 was eventually given to Diedrich or used for his benefit.

Diedrich contends that the jury could not have concluded beyond a reasonable doubt that he or Rose offered Rose's Fullerton land for $150,000 over its market price in exchange for Diedrich's help in terminating the agricultural preserve. The record belies this contention.

There were four people present at the Jolly Fox when the disputed statement was allegedly made: Richard Owen, Grant's president, William Stark, AHI's president, Rose and Diedrich. Owen testified to the statement. Stark testified that he could not remember any of the conversation at the Jolly Fox, but did remember leaving the table. Rose and Diedrich denied that the statement was made.

---

[5]Somewhat redundantly, Penal Code section 7 defines a "bribe" for the purposes of the Penal Code as "anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his action, vote, or opinion, in any public or official capacity."

At trial, defense counsel introduced Owen's testimony at a pretrial hearing as evidence of a prior inconsistent statement. At the earlier hearing, Owen testified that he was "very suspicious of politicians, and ... just *assumed* that if they got [$]150,000, their cooperation would be there." (Italics added.) When questioned about the prior statement, Owen maintained that the connection between the purchase of the Fullerton land and releasing Anaheim Hills from the agricultural preserve, was, in fact, made explicit by the statement that the purchase would "materially help" getting Anaheim Hills out of the preserve.

From this testimony a jury could, of course, have concluded that the statement alleged by Owen was made. Actually, even if the statement was not made, the jury could have concluded that a request for a bribe was implicit in the offer of grossly over-priced land at the time AHI was seeking Diedrich's support in removing Anaheim Hills from the agricultural preserve.

The jury could also have concluded that even if the entire discussion of the Fullerton land had not taken place, Diedrich was guilty of accepting a bribe based on his suggestion that AHI hire Michael Remington and the financial transactions that took place after he was hired. Diedrich argues that Remington's hiring could not have been a bribe because every witness who testified as to the hiring of Remington, especially Owen, swore that he was hired on the merits as an attorney, not as part of a scheme to commit bribery.[6] While no direct testimony suggested that Remington was hired as a conduit for a bribe, Owen's motivations in hiring Remington are immaterial to the issue of whether an "understanding" existed. The terms "agreement," and "understanding" as used in the bribery statutes are terms of art. In *People* v. *Fitzpatrick* (1926) 78 Cal.App. 37, 45 [247 P. 601], the court noted: "The agreement referred to ... in section 165 of the Penal Code ... is not the kind of agreement contemplated by the civil law of contracts, under

---

[6]Owen testified that, at the time he hired Remington, "it was very, very obvious that I needed someone to help me .... And it wasn't the type of situation that at the time I interpreted as being anything other than being a friendly, helpful-type recommendation." Owen also testified that he called others to verify Remington's qualifications and only hired him after concluding that he was a capable attorney. It is clear, however, that Owen's attitude toward Remington changed during the course of their discussions. Owen testified that while talking to Remington, the events at the Jolly Fox dinner influenced his decision to hire him. Later, when Remington developed legal trouble, Owen immediately sent his new attorney to Remington's office to retrieve the AHI files. As noted, he was particularly concerned that the district attorney's office should not obtain them.

which there must be an actual meeting of the minds of contracting parties in order to form an agreement.... The terms of the statute are met if it is proven to the satisfaction of a jury that the defendants [i.e., the bribe-takers] have 'agreed' or intended in their own minds to receive a bribe." Similarly, the court in *People v. Gliksman* (1978) 78 Cal. App.3d 343, 350-351 [144 Cal.Rptr. 451] concluded: "It is the state of mind of the actual or potential bribe-receiver that is determinative; a bilateral agreement is not necessary." (See also, *People v. Squires* (1893) 99 Cal. 327, 330 [33 P. 1092]; *People v. Vollmann* (1946) 73 Cal.App.2d 769, 788 [167 P.2d 545]; *People v. Brigham* (1945) 72 Cal.App.2d 1, 7 [163 P.2d 891]; *People v. Kerns* (1935) 9 Cal.App.2d 72, 75 [48 P.2d 750].)

There was ample testimony regarding the Remington-Diedrich relationship from which the jury could have concluded that through Remington as his agent, Diedrich accepted money from AHI with the understanding that his official conduct would thereby be influenced. First, Diedrich was instrumental in setting up the agreement between AHI and Remington. It was he who suggested that Owen hire Remington, he who set Remington's fee by suggesting that the case was of the "$100,000 variety," and he who instructed Remington to handle the case outside of his regular law practice. Clearly, Diedrich exercised considerable control over Remington's actions vis-à-vis AHI.

Stark, the president of AHI, apparently viewed the arrangement as improper. He testified that after signing a $13,000 check to Remington, he refused to sign additional checks because he "didn't like what [he] was feeling." He further testified, "I didn't hire this gentleman. I felt uncomfortable for what I considered to be very large amounts of money for, in my view, or at least to my knowledge, very little work. And I didn't feel I could sign it and uphold my responsibilities to our Texaco partners." As noted, Remington produced two short documents for the $74,000 he was ultimately paid.

Remington himself realized that the arrangement was improper, commenting to his office manager, Donna Doughty, that he was to be Diedrich's "bagman." When Doughty asked what Remington meant, he explained that a bagman was a person who acted as a go-between for a politician and a company seeking a favor. Doughty also indicated that Remington had referred to the 17-page document he prepared for AHI as "window dressing." Remington's failure to pursue the balance of his

fee—over $25,000—"owed" to him by AHI further suggests that he did not view the payments as compensation for services rendered.

Remington testified that after AHI became his client, Diedrich called him and told him that now that he had "lots of money," he could "lend some of it out where [Diedrich] wanted it." As noted, Remington complied, writing a $10,000 check to Ben Richman, repaying Diedrich's $30,000 debt to Bill Moore and writing a $25,000 check to Viking Mauna Loa Management Company, Diedrich's sole proprietorship. Remington told Doughty that "for the books" they would call the transactions loans. No formal papers were drawn up reflecting the "loans." Remington testified that the "loans" were never repaid. These facts suggest that Diedrich had an expectation that the money paid to Remington would be his own.

The prosecution relied on two facts which, it claimed, showed that Diedrich's official conduct was actually influenced by the money he received from AHI. The first was a meeting between Diedrich and representatives of the county counsel's office concerning the need for an environmental impact report (EIR) to be prepared in conjunction with removing Anaheim Hills from the agricultural preserve. John Allday, head of the environmental services division for Orange County, testified that he recommended the EIR cover the effects of both the conversion to agricultural zoning and the ultimate development of the land, since it was clear that development was to take place. Diedrich argued that the EIR should cover only the reversion from agricultural preserve to agricultural zoning. In addition, of course, the prosecution heavily relied on the March 6, 1974, resolution and agreement removing AHI from the agricultural preserve.

The evidence easily supports the conviction on count I. In fact, as will be seen in part III of this opinion, it supports it once too often.

B. *Sufficiency of the Evidence—Count II*

■ Diedrich contends that the conviction on count II must be reversed because no evidence was presented that any specific action regarding Anaheim Hills was pending before the board on December 31, 1974, the date identified in the count II indictment. The contention has no merit.

The law does not require any specific action to be pending on the date the bribe is received. Penal Code section 165 prohibits asking or receiving a bribe to effect the consideration "... of any question or matter, upon which [a person named by the statute] *may* be required to act in his official capacity, ..." (Italics added.) The use of the word "may" suggests that payments designed to alter the outcome of any matter that could conceivably come before the official are within the prohibition of the statute.

In *People* v. *Markham* (1883) 64 Cal. 157 [30 P. 620], a contention similar to defendant's was rejected. In *Markham*, a police officer was charged with asking for and receiving a $15 bribe on the understanding that he would not arrest persons for violation of the gaming laws. On appeal Markham contended that no evidence was introduced showing that any one had committed the crime for which he had agreed not to arrest. Affirming the conviction, this court said: "[W]e think when a police officer receives money in consideration of his promise that he will not arrest any one of a class of offenders against the criminal laws, he is guilty of receiving a bribe, because the case of one who has committed the offense, and the consequent duty of the officer to arrest is 'a matter which *may* be brought before him in his official capacity.' We are of the opinion that a police officer who shall receive a weekly stipend, or a single payment of money, in consideration of his promise not to arrest any violator of the gaming law, is not only morally guilty, but may be found guilty under the *statute* ...." (Italics in original; *Markham, supra*, at p. 159.)

In this case, there is ample evidence of matters that might have come before the board of supervisors: (1) zoning approvals for housing tracts to be developed, (2) allocation of gas tax for building roads in the area, (3) use of open space for orchards, and (4) sale of land needed for a flood plain to the county. Evidence concerning each of these issues was received at the trial.

Of overriding importance, however, was the matter left open by the March 1974 vote. As noted, the terms of the March 6, 1974, agreement required AHI to dedicate to the county 954 acres for a perpetual easement in gross. Under the agreement, the boundaries of 504 of these acres were not specified and the county had the right to approve the selections when offered in the future. The land was to be ceded in 100-acre lots beginning in 1976 and continuing yearly until 1981.

According to the testimony of John R. Shaddy, Orange County Manager of Facility Planning, AHI had a considerable stake in the county's approval of land it proffered. Land that was tentatively identified to be conveyed to the county was divided into three categories based on its slope. However, there was no provision in the agreement specifying the acreage in each category that would be conveyed to the county. It was possible, for example, that all of the land conveyed to the county could be in the 30-plus degree category. Depending on the slope of the land eventually selected, the value of the land conveyed could vary from $1.2 million to $2.9 million. The board had discretion to determine whether the land offered met the terms of the agreement. Clearly, the board's pending approval of this land was a matter that *might* come before Diedrich in his official capacity.[7]

■ Diedrich also contends that there was no evidence of any "agreement or understanding" that official action would be influenced by the payments alleged in count II of the indictment. Again we disagree.

Once the agricultural preserve problem was out of the way, the purpose of the bribe alleged in count I was presumably accomplished. Yet a month later, Diedrich called Owen to request a $70,000 loan. In itself, this was questionable behavior for a legislator who had just voted on a matter specifically pertaining to AHI. Owen, in fact, testified that he thought the bribe attempt had ended when Remington encountered his legal problems and that, when Diedrich requested the loan, he thought, "Here it comes again."

Defendants contend that AHI's hiring of Leroy Rose to prepare a conceptual plan was based on his ability as an architect and planner, as well as political influence—that it was not a bribe. A number of witnesses, including Owen, testified that Rose was, in fact, known for his architectural abilities and political clout. Defendants further claim that the project for which Rose was hired was legitimate, not "make work" as the prosecution contended.

There was, however, considerable evidence from which the jury could have inferred that at least a portion of the money flowing to Rose was intended as a bribe for Diedrich. Rose received $142,000 for a conceptual plan that was intended to influence the Anaheim City Council, but never appeared before the council to argue about grading ordinances.

---

[7]At the time of trial, the board had not taken action on this matter.

The council completed action on the proposed ordinance before a brochure explaining the plan was prepared. The plan Rose ultimately prepared, which was never implemented, cost almost three times as much as the master plan of Anaheim Hills and the design of the buildings it suggested violated existing building codes.

Although Rose allegedly spent 900 to 1,000 hours on the job and produced a number of drawings and renderings, he was unable to justify his billings adequately. He testified that, of the approximately $142,000 he was ultimately paid, $60,000 was for his own efforts and the remainder for his employees' services. However, he could not produce time records establishing his employees' hours. He was also unable to fully document his own fees—testifying at one point that he billed AHI at $30 an hour (or $30,000 for 1,000 hours) but then explaining that the $60,000 figure was reached by adding fees for "liaison work." Rose testified that his fees for liaison work were not hourly but were determined "arbitrarily." The jury could easily have inferred that Rose's assignment was not legitimate.[8]

In addition, there was evidence that Diedrich acknowledged that AHI's payments to Rose were intended for him. In September 1974, the $80,000 note that Owen helped Diedrich secure became due and was in default. Owen, apparently concerned that the default would jeopardize his own relations with the bank, called Diedrich and urged him to pay the loan. Diedrich responded to Owen's request: ". . . Mr. Rose hasn't paid me and you haven't paid him."

Shortly after the call, AHI began to pay Rose substantial sums. Rose, in turn, paid $10,000 directly to Diedrich and $40,000 to Remington. Remington then cashed the checks from Rose and paid most of the money to Diedrich.

The defendants' explanation of the pattern of payments flowing from Rose to Remington to Diedrich was wholly inadequate, raising more questions than it put to rest. Rose claimed that $30,000 paid to Remington was a finder's fee for architectural projects that Remington had directed to Rose and that $10,000 was a legal fee for collecting a debt.

---

[8]The jury did not need to conclude that Rose's work was entirely spurious because the amounts of money flowing from Rose to Diedrich demonstrate that Rose retained a significant portion of the money from AHI. Of the about $140,000 Rose received from AHI, he paid $10,000 directly to Diedrich and $40,000 to Remington. He may have retained as much as $90,000.

However, Rose was unable to specify the work Remington had done to earn these fees, commenting at one point: "We never questioned people about finder's fees." No agreement was drawn up between Rose and Remington regarding Remington's purported legal services for Rose.

Remington's testimony was strongly at odds with Rose's explanation of the payments. Remington testified that in late 1974 Diedrich asked if he could "handle some additional income" that year. He agreed. Shortly thereafter, Remington began to receive checks from Rose. When he called Rose to ask why the checks had been sent, Rose responded: "Talk to Ralph [Diedrich]." Diedrich instructed Remington to "run [the money] through [his] practice and pay the tax on it and give [Diedrich] the balance in cash." Remington testified that he did no work for Rose during this period, and that Rose had no financial obligation to him.

Remington testified that he cashed the checks from Rose and, after keeping a small portion with which to pay taxes,[9] gave the cash to Diedrich. Although Diedrich denied that he received any cash from Remington during this period, the pattern of Remington's checking account deposits and Diedrich's payments on his loan support Remington's testimony.[10] All of this evidence strongly suggests that Diedrich not only received money from AHI, but that he actively attempted to hide the payments.

In sum: While there is no express evidence of any "agreement or understanding," the proven facts not only imply one, but are virtually irreconcilable with any other theory. The jury's conclusion that Diedrich was guilty as charged in count II was amply justified.[11]

---

[9]Because of other deductions, Remington actually suffered no tax liability as a result of having passed the money through his account.

[10]Remington cashed a $10,000 check from Rose on October 10, 1974. Diedrich made a $23,153 payment on his bank loan on the same date. Remington deposited another $10,000 check from Rose on November 21, 1974, withdrawing $9,000 in cash a day later. Diedrich made a $10,000 loan payment the same day. Remington deposited two $10,000 checks from Rose on December 30, 1974. A day later he withdrew $20,000 in cash. Diedrich made a $10,000 payment on his loan the same day and another four weeks later. This pattern clearly supports Remington's testimony that the money he received from Rose was, in fact, given to Diedrich.

[11]The prosecution also contends that even if the December 31, 1974, payment was made for the March 6, 1974, vote to release AHI from the agricultural preserve it would be a sufficient quid pro quo to justify the verdict on count II. The defense, on the other hand, argues that the official action which is the subject of the bribe must be

## III

### Instructions

■ Diedrich complains that as to count I the court's instruction permitted the jury to convict him without agreeing on a single, specific act of bribery as the basis for the conviction. (*People v. Castro* (1901) 133 Cal. 11, 13 [65 P. 13]; cf. *People v. Rogers* (1978) 21 Cal.3d 542, 550 [146 Cal.Rptr. 732, 579 P.2d 1048].) He is correct.

Diedrich requested an instruction which read, in part, as follows: "Before the jurors may return a verdict of guilty, they not only must unanimously agree that the defendant asked for, received or agreed to receive a bribe, *they must unanimously agree upon at least one particular act* of asking for, receiving or agreeing to receive a bribe . . . ." (Italics added.) The instruction was refused.

The refusal to give the requested instruction was error as far as count I is concerned. As explained, the evidence shows two distinct violations of section 165 during the period alleged in that count—January to April 1973. The first was the rejected Jolly Fox offer to sell land at an inflated value. The second was the later hiring of Remington to channel funds to Diedrich.

Attempting to distinguish *People v. Alva* (1979) 90 Cal.App.3d 418 [153 Cal.Rptr. 644], a case involving various sexual offenses, in which the conviction was reversed because of the trial court's failure to give an instruction such as was requested here, the People assert that "unlike rape, which by definition occurs at a precise moment, bribery (asking, receiving, or agreeing to receive) may logically take place over a period of time."[12] Whatever could logically happen, this is not what the People argued to the jury. Thus, with respect to the significance of the Jolly

---

action which is to take place in the future. "This is necessarily true because past official action, having already been concluded, could not be influenced and could not, of course, be the subject of an understanding that it would be influenced."

The issue is academic. The record would not support a contention that the jury was misled into basing the convictions on counts II and III on the theory that the payments which started in the summer of 1974 were in consideration of past services rendered on March 6 of that year.

[12]The People may well be correct as far as the Remington "fee" is concerned. When an official actually receives a bribe, the chances are that at some earlier point he asked for it or agreed to receive it or did both. Our holding in no way implies that Diedrich violated the section more than once in connection with Remington. The point has not even been argued.

Fox offer, the prosecutor urged: "Remember [Diedrich's] comment on January 16, 'Buying the land overpriced will help you get the land out of the agricultural preserve, ...' [¶] *So at that point the crime is completed.*" (Italics added.) There simply is no escape from the fact that two separate violations of section 165 were proved under the umbrella of count I and that at no point was the prosecution required to elect between the two violations; nor was the jury instructed that it had to find unanimously that Diedrich had committed at least one of them. As we said in the seminal case of *People* v. *Castro, supra*, 133 Cal. at page 13: "The state, at the commencement of the trial, should have been required to select the particular act upon which it relied to make good the allegation of the information. This was not done; and even conceding that the failure to make such election at that time did not constitute error because of the want of demand upon the part of the defendant to make the election, still, when the case went to the jury, the court, in some form, should have directed their minds to the particular act of intercourse which it was incumbent upon the state to establish by the evidence, before a verdict of guilty could be returned against the defendant. This was not done." (See also, *People* v. *Williams* (1901) 133 Cal. 165 [65 P. 323].) The reasons for requiring jury unanimity on at least one particular crime shown by the evidence are too obvious to require another restatement. (See *People* v. *Alva, supra*, 90 Cal.App.3d at pp. 424-425.)

To be sure an exception to the rule has developed over the years.[13] Although it is sometimes referred to as the "continuous conduct exception," analytically, the cases comprising it involve several different situations. The most closely analogous precedent is a 1913 case involving the then law of abortion. Section 274 of the Penal Code which continues to define that crime and section 165 have certain similarities in approach: each makes criminal only the preliminary steps leading up to the real evil at which the statute is aimed—an induced miscarriage in one case, corrupt official action in the other—without requiring that the objective of the preliminaries be actually achieved. In any event, in *People* v. *Simon* (1913) 21 Cal.App. 88 [131 P. 102] the defendant, on two occasions over a month apart, inserted an instrument in the same patient for the purpose of procuring a miscarriage. Charged in a single count, defendant demanded that the People elect "as to which operation [they] would rely upon for a conviction...." (*Id.*, at p. 90.) The People

---

[13]Many of the authorities are collected in two recent cases: *People* v. *Madden* (1981) 116 Cal.App.3d 212, 217-218 [171 Cal.Rptr. 897] and *People* v. *Epps* (1981) 122 Cal.App.3d 691, 702-703 [176 Cal.Rptr. 332].)

refused to elect and the trial court denied a request to compel them. The conviction was nevertheless affirmed, the court holding that "all the acts may be and justly should be treated as done in the commission of one and the same crime." (*Id.*, at p. 91.) The problem with *Simon* as precedent is, however, that it is wrong. In *People v. Rhoades* (1949) 93 Cal.App.2d 448 [209 P.2d 33] the court correctly held that "the crime [Pen. Code, § 274] is not the actual consummation of an abortion as such but rather it is the performing of any of the acts ... with the intent to procure a miscarriage ...." (*Id.*, at p. 450; see also *People v. Wilkes* (1960) 177 Cal.App.2d 691, 698 [2 Cal.Rptr. 594].) Thus, even if we eschewed analysis and decided to rely blindly on *Simon* as the most closely analogous precedent, we would find that the rug has been pulled out from under us.

Nor, as far as count I is concerned, do any of the other situations which form part of the conglomerate "continuous crime" exception apply. The two offenses were not so closely connected in time that they formed part of one transaction (e.g., *People v. Mota* (1981) 115 Cal. App.3d 227, 231-234 [171 Cal.Rptr. 212] [repeated acts of rape during one hour]; *People v. McIntyre* (1981) 115 Cal.App.3d 899, 907-911 [176 Cal.Rptr. 3] [two acts of oral copulation within "matters of minutes"]), nor is bribery the type of offense which, in itself, consists of a continuous course of conduct. (E.g., *People v. White* (1979) 89 Cal. App.3d 143, 151 [152 Cal.Rptr. 312] [pandering]; *People v. Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299] [child abuse]; *People v. Lowell* (1946) 77 Cal.App.2d 341, 346-348 [175 P.2d 846] [contributing].)

We conclude, therefore, that the trial court erred in refusing Diedrich's proffered instruction or in failing to give a substitute, such as CALJIC No. 17.01.[14] The next question is whether the error was preju-

---

[14]CALJIC No. 17.01: "VERDICT MAY BE BASED ON ONE OF A NUMBER OF UNLAWFUL ACTS [¶] The defendant is charged with the offense of —. He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

dicial. We feel bound to hold that it was. This is not a case where the jury's verdict implies that it did not believe the only defense offered. Diedrich's defenses differed: As far as the Jolly Fox offer is concerned, it consisted of a simple denial. The Remington transactions were "explained." Having in mind that the proof of the Jolly Fox offer depended, essentially, on the testimony of a single immunized witness and that the proof of bribery via the Remington transaction was somewhat circumstantial, we feel bound to conclude that the error was prejudicial.

Defendants[15] also contend that the trial court's failure to instruct, *sua sponte*, on the lesser included offense of accepting a gratuity for an official act (Pen. Code, § 70) is reversible error. The contention is contrary to existing law.

■ Whatever a trial court's duty to give *sua sponte* instructions may be, it need not instruct on a lesser included offense barred by the statute of limitations. (*People* v. *Vallerga* (1977) 67 Cal.App.3d 847, 881-883 [136 Cal.Rptr. 429].) Defendants concede that prosecution under section 70 was barred and that *Vallerga* squarely holds contrary to the point they raise. They suggest, however, that we reject *Vallerga* because it is inconsistent with the rationale underlying the requirement that instructions on lesser included offenses be given. Specifically, they argue that "failure to instruct on lesser degrees left the jury with an 'all or nothing' choice and created an improper pressure to convict of the higher offense." The issue, defendants claim, is one of "fundamental fairness."

While *Vallerga* does, in fact, appear to be the only California case that squarely deals with this issue, its holding is supported by authority from many jurisdictions. (See, e.g., *Chaifetz* v. *United States* (D.C.Cir. 1960) 288 F.2d 133, revd. on other grounds (1961) 366 U.S. 209 [6 L. Ed.2d 233, 81 S.Ct. 1051]; *Holloway* v. *State* (Fla.App. 1978) 362 So. 2d 333, 334, cert. den. (1980) 449 U.S. 905 [66 L.Ed.2d 137, 101 S.Ct. 281]; *Johnson* v. *State* (1976) 365 Ind. 470 [355 N.E.2d 240, 242], cert. den. (1977) 430 U.S. 915 [51 L.Ed.2d 593, 97 S.Ct. 1326]; see generally, Annot. (1956) 47 A.L.R.2d 887.) The logic of the *Vallerga* rule is apparent. Since the defendant could not, at the time of his trial, have been convicted of a violation of Penal Code section 70, an instruc-

---

[15]While this contention is advanced on behalf of both defendants, it is not explained how Rose could have been aggrieved by the alleged error.

tion on that section would have served no purpose. As the court of appeals noted in *Chaifetz*, the rule requiring an instruction on lesser included offenses "is not to be read as conferring a blanket right without qualification. Quite clearly it refers to offenses for which convictions might be had upon the proof adduced." (*Chaifetz, supra*, 288 F.2d at p. 136.)

## IV

### CONSPIRACY—STATUTE OF LIMITATIONS

■ The indictment on which defendants were tried was filed on December 15, 1977. As we have seen, Diedrich received $20,000 through the AHI-Rose-Remington pipeline as late as December 31, 1974. Yet both he and Rose argue that the three-year statute of limitations applicable to conspiracy (Pen. Code, § 800, subd. (a))[16] barred count III as a matter of law. This claim is based on the assumption that the primary object of the conspiracy was Diedrich's March 6, 1974, vote and that, at the very latest, the statute started to run that day. (*People v. Zamora* (1976) 18 Cal.3d 538, 546-560 [134 Cal.Rptr. 784, 557 P.2d 75].)

We have already exposed the error in defendant's assumption. The March 6, 1974, vote removing Anaheim Hills from the agricultural preserve did not end AHI's concerns with the board. There were potential problems relating to zoning, roads, open space, flood plains and, above all, specification of the acreage subject to the easement. While Rose had been a party to the dealings between Diedrich and AHI from the very beginning, it will be recalled that a few weeks after the March 6 vote Grant declined his professional services. Yet Rose's intensive involvement in the flow of funds from AHI to Diedrich started in the summer of 1974. Something had happened to persuade AHI to pay Rose huge sums for services which AHI did not need and which Rose, in large part, did not render. Clearly the jury could infer that a new inning had started in the summer of 1974 and that the $20,000 Diedrich received in late December 1974 was a bribe for future favors, rather than a late payment or gratuity for the March 6, 1974, vote. In fact, there was no evidence which would have supported the latter theory.

---

[16]The limitations period applicable to the substantive counts of bribery is six years. (Pen. Code, § 800, subd. (b).)

█ Alternatively, defendants claim that the trial court erred in refusing two instructions—copied below—which, they assert, were essential on the issue of when the conspiracy terminated.[17]

There was no error. First, the jury was adequately instructed on the subject of limitations.[18] Second, the proffered instructions are extremely

[17]The rejected instructions read as follows: "[CONSPIRACY—ACTS AFTER TERMINATION AND FINDING OF OBJECTS] No act or declaration of a conspirator that he committed or made after the conspiracy has terminated is binding upon his coconspirators, and they are not criminally liable for any such act. Conspiracy constitutes a crime even though the primary object of the conspiracy may not be carried out. If a crime which was the primary object of a conspiracy was carried out, *the fact that some payment may have been due and unpaid from one conspirator to another* as payment for the commission of such crime does not, standing alone, extend the conspiracy beyond the time of commission of the crime which was the primary object. If, however, activities of the conspirators were undertaken to carry out significant objectives of the conspiracy, *other than mere payment of debts between conspirators*, after attainment of its primary object, the conspiracy continues until those significant objectives are either attained or abandoned. [¶] The defendants Ralph A. Diedrich and Leroy Rose are charged in Count III with conspiracy to commit the crimes of asking for, receiving and agreeing to receive a bribe in violation of Penal Code section 165. [¶] In order to find the defendants guilty of the crime of conspiracy, you must find beyond a reasonable doubt that they conspired together to commit a particular crime and you must unanimously agree as to what particular criminal acts were the primary object of such conspiracy. [¶] You will include a finding on what the primary object of such conspiracy, if any, was on a form that will be supplied to you for that purpose. In addition thereto, if you find that there was such a conspiracy, you will also include a finding on the same form as to when that conspiracy terminated." (Italics added.)

"[TERMINATION OF CONSPIRACY AND FINDINGS] I have not intended by anything I have said or done to suggest that a conspiracy did or did not exist in this case. However, if, from all of the evidence in the case, you should find beyond a reasonable doubt that a conspiracy, as I have defined it in these instructions, did exist, then it will be your duty to make findings as to what the primary object of the conspiracy was and when it terminated. [¶] A conspiracy terminates when the crime which is its primary object is accomplished or abandoned. Provided, however, that if the conspirators undertake activities in furtherance of a significant objective of the conspiracy beyond the attainment of the primary object of the conspiracy, it terminates when that additional significant objective is accomplished or abandoned. *Mere payment of a conspirator for his part in a conspiracy* after accomplishment of the primary object of the conspiracy does not, without more, extend the life of the conspiracy beyond the time that its primary object is attained. [¶] You will make a finding on a form provided for that purpose what the primary object of the conspiracy, if any, in this case was and, in addition, you will make a further finding on the same form as to when that conspiracy terminated." (Italics added.)

[18]The instruction read in part: "In order to find the defendants guilty of the crime of conspiracy you must find beyond a reasonable doubt that the defendants conspired to commit one or more of said crimes and you must unanimously agree as to which particular crime or crimes they conspired to commit. [¶] This action was commenced on December 15, 1977, by the filing of an Indictment. [¶] With respect to Count Three thereof, the alleged conspiracy, you are instructed that if you find that the primary object of the conspiracy was achieved or completed before December 15, 1974, you should find both defendants not guilty of this count. Said primary object is to ask for, receive or agree to receive a bribe."

confusing in that they constantly suggest that some unidentified crime —presumably the corrupt official act which, as we have seen, forms no part of the crime of bribery—may be the primary object of a conspiracy to violate section 165. Further, the instructions never identify the mysterious "additional significant objectives" they mention. Third, the instructions appear to be premised on a legal proposition which is simply wrong—that receipt of payment cannot itself be the primary object of a conspiracy to commit bribery. This fallacy is based on a misreading of three recent cases—*People* v. *Saling* (1972) 7 Cal.3d 844, 851-853 [103 Cal.Rptr. 698, 500 P.2d 610], *People* v. *Leach* (1975) 15 Cal.3d 419, 428-438 [124 Cal.Rptr. 752, 541 P.2d 296] and *People* v. *Zamora, supra*, 18 Cal.3d at pages 546-560—in which we discussed problems relating to the termination of conspiracies.[19] In *Saling* and *Leach* the substantive crimes planned by the conspirators were murder, in *Zamora* they were arson, burning of insured property and grand theft. Receipt of payment for services rendered is not a part of any of these crimes, although it may well be a conspirator's motive. ■ When, however, the conspiracy is one to commit bribery, the receipt of payment is more than a mere motive—it may be the very way in which the bribe-seeker plans to violate section 165. ■ Yet, if one suggestion pervades the two instructions, it is that payment to a conspirator for his part in the conspiracy is a neutral fact, at least if it is made after the primary object of the conspiracy—whatever it may be—has been attained, even though the conspiracy may still be alive with respect to other "significant objectives." What all this is supposed to have conveyed to the jurors is anyone's guess, particularly since the court had correctly defined the primary object of a conspiracy to violate section 165 as asking, *receiving* or agreeing to receive a bribe.

While, as noted, it is difficult to ascertain just what the instructions were supposed to tell the jurors, it seems fairly certain that they had a tremendous potential for unfairly gutting the prosecution's theory of the case, which was that after the March 6, 1974, vote, when AHI thought it was through with Diedrich and Rose, a new conspiracy to commit bribery came into existence sometime during the summer of 1974, when Rose was hired and launched his program of overpaid make-work and that at least one act in pursuance of that conspiracy—Diedrich's receipt of $20,000 on or just after December 31, 1974—took place within the

---

[19]In *Saling* and *Leach* the discussion was relevant to the admissibility of coconspirators' statements under section 1223 of the Evidence Code. Only *Zamora* involved a limitations issue.

three-year statutory period. Closely read, the instructions just about invited the jury to find that this payment was of no significance, even if it was made before "additional significant objects" of the conspiracy were accomplished. As already noted, the instructions never told the jury what object or objects might qualify as "primary" under the law, nor did they suggest what the additional "significant" objects might be. Their main purpose seems to have been to permit the defense to argue that this payment was, at most, a postperformance payment or gratuity for the March 6, 1974, vote and, thus, under the defense theory on the law, did not qualify as a bribe for future official action. (See fn. 11, *ante.*) The difficulty is that, whatever may be the legal merits of that theory, the record contains no evidence whatever that the funds fed to Diedrich through Rose starting in about June 1974 in general, or the December 31, 1974, payment of $20,000 in particular, had anything to do with the vote of the previous March.

The judgment as to Diedrich is reversed as to count I. It is affirmed in all other respects. The judgment as to Rose is affirmed.

Bird, C. J., Mosk, J., Richardson, J., Newman, J., and Broussard, J., concurred.