Filed 7/24/15  P. v. Feeter CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039750 |
| Plaintiff and Respondent, | (Santa Cruz County<br>Super. Ct. No. F22273) |
| v. | |
| CHRISTINE ELLEN FEETER, | |
| Defendant and Appellant. | |

Following a jury trial, defendant Christine Feeter was convicted of burglary (Pen. Code, § 459),[1] stalking (§ 646.9, subd. (a)), and contempt of court (§ 166, subd. (c)(1).)  On appeal, defendant asserts the trial court erred in failing to give a unanimity instruction for the burglary charge, and in sentencing defendant separately for the stalking and contempt of court charges.

### STATEMENT OF THE FACTS AND CASE

The present case stems from the failed relationship of the victim, and her former husband, Richard Van Dine.  The couple was married in August 2008 and divorced in December 2010.  From the time of their separation in February 2010, defendant sent a high volume of e-mails, and texts to Van Dine.  Some of the communications were related to their divorce, but many were abusive and

---

[1] All further statutory references are to the Penal Code.

demeaning.  Eventually, Van Dine asked appellant to stop calling, e-mailing, and texting him.  In an e-mail dated September 24, 2010, Van Dine told appellant: "Christi, you sent me 20 texts. . . .  [¶] Eight calls yesterday afternoon alone. . . .  [¶] This is excessive and invasive, so no more phone or text contact.  Thanks. And stop sending me all these excessive long emails, or I'll just block those too."  He also asked appellant to stay away from his residence.  However, appellant did not stop contacting Van Dine or coming to his home.

After the couple's divorce became final in December 2010, Van Dine blocked appellant from his phone, e-mail, and Facebook account.  Defendant continued to e-mail Van Dine's friends, and drop-off letters and gifts to Van Dine. On February 14, 2011, appellant left a gift basket for Van Dine at the front house where he was staying at the time.

In June 2011, Van Dine moved back into a studio where he had lived previously.  Van Dine discovered letters and some concert tickets that defendant had left for him at his studio.  During this time, Van Dine saw defendant parked near his studio, and driving nearby on a number of different occasions.  Van Dine began to notice items missing from his home, including a large golf umbrella and a pair of sunglasses.

During the period between June 2011 and January 2012, Van Dine continued to receive e-mails, letters and gifts from defendant.  Defendant also sent e-mails and letters to Van Dine's friends accusing Van Dine of wrongdoing.  Defendant was volatile in her communications with Van Dine, expressing both love and hate for him in the same messages.  On July 15, 2011, Van Dine's truck was vandalized in front of his house and he suspected defendant was responsible.

On January 14, 2012, Van Dine's outrigger paddle was stolen from his

2

front porch, and Van Dine suspected defendant had taken it.  Defendant e-mailed Van Dine one week later asking him to meet her because defendant had something to give him that she knew he wanted.  Van Dine believed it was the paddle.

Following the theft of the outrigger paddle, Van Dine installed a surveillance system at his home.  Van Dine put two cameras on the outside of the studio to monitor the deck area and the front door, and installed one camera in the bedroom.  The security monitor was on a desk in the kitchen.  There was also another camera that was not installed on the desk in the kitchen.

On February 14, 2012, Van Dine came home around 5:15 in the afternoon, and found a vase of roses and a gift bag from defendant on his front porch.  Van Dine left the gifts on the porch and went out for the night.  Van Dine locked the door to his house on the way out.  When Van Dine came home that night, he noticed that one of the outdoor surveillance cameras was missing and the wires had been ripped out.  Van Dine also saw that the roses and gift that had been left on the porch were gone.  The front door of his house was locked from the inside, but not the way he had left it.  When Van Dine went into the house, he saw that his jacket, the surveillance camera that had been on the kitchen table, and a set of headphones was missing from his bedroom.

The video surveillance footage from the day of the burglary showed defendant coming up to the front porch of Van Dine's house around 4:00 in the afternoon, opening the front door with a key, coming back outside, and leaving roses and a gift bag.  The video then showed defendant coming back to the house around 6:45 in the evening.  One of the surveillance cameras on the porch showed defendant pulling the other porch camera and its wires out.  The remaining porch camera showed defendant use a key to enter the house, and come out of the house

with a shopping bag and an armful of Van Dine's property, including his jacket. The video also showed defendant taking the flowers and the gift bag that she had previously left on the porch.

After watching the surveillance video, Van Dine called the sheriff's department. Van Dine discovered other property missing from his house, including an iPod from the bedroom, a toiletry bag and medications from the bathroom, a digital camera and a pocket-knife from the kitchen, Van Dine's passport from his files in the kitchen, vitamins from the refrigerator, and a spare set of keys from the kitchen cabinet.

Based on information from Van Dine, a sheriff's deputy contacted defendant at her home. Defendant denied any knowledge of the theft of property from Van Dine's home. The deputy searched defendant's car and found the roses, gift bag, note, and a set of keys on the console similar to those described by Van Dine. One of the keys tested on Van Dine's door unlocked the door.

On May 2, 2012, an inspector from the district attorney's office interviewed defendant. Defendant told the inspector that she had found some old keys belonging to Van Dine in a junk drawer at her home. On Valentine's Day, defendant went to give a gift to Van Dine at his house and out of curiosity, tried one of the keys on the door. Defendant told the investigator that the key unlocked the door, but she did not go inside the house. After leaving the gifts at Van Dine's house, defendant drove by her friend's house and saw Van Dine's truck parked outside. Defendant told the investigator that she was upset that Van Dine was visiting one of her friends. Defendant then went back to Van Dine's house and went inside. Defendant admitted that she went into the house and took medications from his bathroom, his jacket, headphones and a key ring. Defendant also admitted to placing a GPS on Van Dine's truck to track his whereabouts.

4

After the burglary, Van Dine changed the locks to his home. On February 16, 2012, Van Dine found a GPS tracking device under his truck. Van Dine obtained an emergency protective order requiring defendant to stay 100 yards away from Van Dine and his home. The temporary protective order was in effect until February 22, 2012. Appellant was served with the protective order on February 17, 2012.

On February 29, 2012, Van Dine obtained a more permanent restraining order against defendant preventing her from communicating with him in any manner, or being within 100 yards of Van Dine or his residence. The protective order stated that defendant "[m]ust have no personal, electronic, or written [contact]" with Van Dine and the order was to be in effect for three years.

On May 29, 2012, Van Dine received an e-mail from appellant that said, "[s]orry." That same day, a preliminary hearing had been scheduled in this criminal case but had been continued.

At trial, defendant testified that she continued contacting Van Dine after their divorce because she wanted closure of the relationship and he responded to some of her e-mails. Defendant said that she was angry and frustrated in some of the e-mails because Van Dine owed her on a large financial debt that had not been resolved. Defendant left gifts for Van Dine during his birthday and holidays as a gesture of peace with the hopes of having a relationship without animosity.

Defendant testified that Van Dine had given appellant a key to his house in 2005 when he asked defendant to care for his cat while he was in Hawaii. When Van Dine returned from his trip, he told defendant to keep the key. After they separated, defendant found two sets of keys to Van Dine's house in a junk drawer at her home. She was curious if the keys still worked.

Defendant admitted having placed the GPS tracking device on Van Dine's truck. She had been getting mixed messages about Van Dine's income and there were still unresolved financial issues between them. Defendant had been preparing to file a civil lawsuit and wanted to find out at which construction site he was working in order to serve him with the papers.

Defendant testified that she did not go into Van Dine's home on February 14 with the intent of taking his property. At the time, defendant felt betrayed and wanted to find proof that Van Dine and her friend were on a date and involved in a romantic relationship. Defendant said that she went into the bathroom and took Van Dine's toiletry bag, and prescription medications to show her friend that Van Dine was taking Cialis and lying. Defendant testified that she was upset and took Van Dine's jacket because it smelled like him, a key ring with her house key on it, and headphones from the bedroom that belonged to her son. Defendant denied taking Van Dine's camera or iPod.

Appellant admitted that she e-mailed Van Dine on May 29, 2012, in violation of the restraining order issued against her on February 29, 2012. Appellant affirmed that she had been present when the terms of the no-contact order were read by the court.

Defendant was charged by information with first degree residential burglary (§ 459), stalking (§ 646.9, subd. (a)), and contempt of court (§ 166, subd. (c)(1).). Following a jury trial, defendant was found guilty of all three counts. The court sentenced defendant to a total term of four years in state prison for burglary, a consecutive term of eight months for stalking, and 180 days in county jail for contempt of court. Defendant filed a timely notice of appeal.

6

Defendant agues on appeal that the trial court erred by failing to give a unanimity instruction as to the burglary charge, and by sentencing defendant for all three of her crimes separately in violation of section 654.

*Unanimity Instruction*

Defendant asserts the trial court had a sua sponte duty to give a unanimity instruction on the burglary charge because the prosecutor argued to the jury that defendant committed multiple acts that were separate burglaries.

The unanimity instruction is as follows: "The defendant is charged with [burglary] . . . . [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act [he] committed." (CALCRIM No. 3500.)

In a criminal case, a jury verdict must be unanimous and the jury must agree unanimously that the defendant is guilty of a specific crime. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.] For example, in *People v. Diedrich* [(1982)] 31 Cal.3d 263, the defendant was convicted of a single count of bribery, but the evidence showed two discrete bribes. [The California Supreme Court] found the absence of a unanimity instruction reversible error because without it, some of the jurors may have believed

the defendant guilty of one of the acts of bribery while other jurors believed him guilty of the other, resulting in no unanimous verdict that he was guilty of any specific bribe.  (*Id*. at pp. 280-283.)  'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done something *sufficient* to convict on one count.' "  (*Ibid*.)

"On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty.  (See generally *People v. Jenkins* (2000) 22 Cal.4th 900, 1024-1026 . . . .)  The crime of burglary provides a good illustration of the difference between discrete crimes, which require a unanimity instruction, and theories of the case, which do not.  Burgalry requires an entry with a specified intent.  (Pen. Code, § 459.)  If the evidence showed two different entries with burglarious intent, for example, one of a house on Elm Street on Tuesday and another of a house on Maple Street on Wednesday, the jury would have to unanimously find the defendant guilty of at least one of those acts.  If, however, the evidence showed a single entry, but possible uncertainty as to the exact burglarious intent, that uncertainty would involve only the theory of the case and not require the unanimity instruction."  (*Russo, supra*, 25 Cal.4th at pp. 1132-1133.)

"The key to deciding whether to give the unanimity instruction lies in considering its purpose.  The jury must agree on a 'particular crime' (*People v. Diedrich, supra*, 31 Cal.3d at p. 281); it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [the defendant]

8

guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Russo, supra*, 25 Cal.4th at pp. 1134-1135.)

Here, at the conclusion of trial, the jury was instructed with CALCRIM No. 1700 on the crime of burglary. Specifically, the court instructed the jury: "To prove that the defendant is guilty of [burglary], the People must prove that: [¶] 1. The defendant entered a building, or any room within a building; [¶] AND [¶] 2. When she entered the building, or when she entered any room within the building, she intended to commit theft."

The prosecutor argued to the jury "And so we know the order of where [defendant] went doesn't really matter. Because only she knows where she went. Mr. VanDine doesn't know in which order she went. But as soon as she went from outside to inside and began taking items, that's burglary. As soon as she went from the main room to the bedroom, that's burglary. And stole items from the bedroom. [¶] . . . [¶] Because each time she goes into a room and takes something, she's showing you she has the intent to steal. [¶] . . . [¶] You must agree that [defendant] had the intent to steal. You must all be unanimous on that but you don't have to agree on whether she entered the home with intent to steal, whether she entered the bedroom, the bathroom or the main kitchen area with the intent to steal. Five of you

9

can think she went into the bedroom to steal with the intent to steal. Five of you can think she went from outside to inside the home with the intent to steal, but you must all 12 of you agree she had the intent to steal"

Under these circumstances, the court was required to give a unanimity instruction. Here, the conviction on the single count of burglary could be " 'based on two or more discrete criminal events,' " in this case, the multiple entries into the house and rooms with the intent to steal. (*Russo, supra*, 25 Cal.4th at p. 1135.) The jury was required to unanimously agree on which entry occurred with the intent to steal to find defendant guilty of a single count of burglary.

While it was error for the court not to give the unanimity instruction on the burglary charge, the error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 286 U.S 18.)[2] Failure to give a unanimity instruction is harmless if the record provides no rational basis for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that the defendant committed all acts if he or she committed any. (*People v. Deletto* (1983) 147 Cal.App.3d 458, 473, disapproved on other grounds in *People v. Pearson* (1984) 106 Cal.App.3d 416.) Here, the evidence that defendant committed burglary was overwhelming. Specifically, the evidence showing defendant disabling the security camera, her coming out of Van Dine's house with a shopping bag containing his property, and defendant's admission to the investigator and at trial that she entered the house intending to take certain items all support the jury's finding of guilt. There was no rational basis for the jury to distinguish between the entries to the

---

[2] There is split of authority as to whether the *Chapman v. California, supra,* 286 U.S. 18 or the standard stated in *People v. Watson* (1956) 46 Cal.2d 818 for prejudice applies to error in failing to give the unanimity instruction. (See *People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 646.) We apply the more stringent *Chapman* standard in this case.

house with the intent to steal and the entries into different rooms inside the house with the intent to steal. We conclude that any error in failing to give the unanimity instruction as to the burglary charge was harmless beyond a reasonable doubt.

***Section 654***

Defendant asserts the trial court erred in sentencing her separately on all three counts, because all three crimes involved the single criminal objective of harassing Van Dine. Specifically, defendant asserts the sentence on count 2 of eight months in state prison and on count 3 of 180 days in county jail should have been stayed pursuant to section 654.

Section 654 provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Section 654 prohibits separate punishment for multiple offenses arising from the same act or from a series of acts constituting an indivisible course of conduct. (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507.)

"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 333, 334.) On the other hand, if the defendant entertained multiple criminal objectives that were independent and not incidental to each other, he or she "may be punished for each statutory violation committed in pursuit of each objective" even though the violations were otherwise part of an indivisible course of conduct. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

11

" 'The principal inquiry in each case is whether the defendant's criminal intent and objective were single or multiple.' [Citation.] 'A defendant's criminal objective is "determined from all the circumstances." ' " (*In re Jose P.* (2003) 106 Cal.App.4th 458, 469.)

The determination of whether a defendant held multiple criminal objectives when committing crimes is a factual issue to be decided by the trial court. (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) The trial court's findings will not be reversed on appeal if there is any substantial evidence to support them. (*Ibid.*) "We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

Our review of the evidence in this case reveals that defendant had different objectives in committing the three crimes. With regard to the burglary, the evidence shows that defendant intended to steal Van Dine's property. Specifically, defendant disabled an outside security camera at Van Dine's home, went inside his home, took numerous things from each room and placed them in a shopping bag. Defendant then left Van Dine's home with the shopping bag containing the things she took. This evidence demonstrates defendant's intent to steal Van Dine's property.

As to the stalking charge, the evidence shows that defendant had numerous unwanted contacts with Van Dine over a period of two years, including unwanted e-mails, and letters to Van Dine. Defendant tracked Van Dine's whereabouts with a GPS device, vandalized his truck and harassed Van Dine's friends. This evidence supports a finding that defendant continuously harassed Van Dine and intended to place Van Dine in reasonable fear for his safety.

Finally, with regard to the contempt of court charge, the evidence shows that the court issued a restraining order against defendant on February 29, 2010. The

12

order prohibited defendant from having any contact with Van Dine, including electronic communication. On May 29, 2010, the same day the preliminary hearing in this case was continued, defendant sent Van Dine an e-mail stating, "[s]orry." This evidence supports a finding that defendant had the criminal intent of making contact with Van Dine in violation of the restraining order.

There is substantial evidence to support the trial court's finding that defendant's criminal objective in committing the three crimes in this case was separate and distinct for each charge. As such, the trial court properly sentenced defendant separately for her three crimes and the sentence did not violate the provisions of section 654.

## DISPOSITION

The judgment is affirmed.

                            _____

                                           RUSHING, P.J.

WE CONCUR:

_____
     ELIA, J.

_____
     WALSH, J.[*]

---

   [*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.