[No. A095637. First Dist., Div. Five. Sept. 19, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS HAYES RAE, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, only the Factual and Procedural Background, part III. of the Discussion, and the Disposition are certified for publication.

**COUNSEL**

J. Peter Axelrod, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Eric D. Share and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GEMELLO, J.**—Defendant Nicholas Hayes Rae appeals his conviction of one count of elder abuse. (Pen. Code, § 368, subd. (b)(1).) He claims error in the admission of evidence of uncharged personal and financial misconduct and instructional error. We hold that the evidence of uncharged misconduct was admissible under Evidence Code sections 1101, subdivision (b) and 1109, subdivision (a)(2) and that the jury instructions were proper. In the published portion of the opinion, we hold that a unanimity instruction under CALJIC No. 17.01 was not required because defendant was engaged in a continuous course of conduct.

We further hold that the trial court did not err in failing to instruct sua sponte on the defense of consent because consent is not available to a defendant charged with abuse.

We affirm the judgment.

### Factual and Procedural Background

Helen Johnson was an 86-year-old widow living alone in her home in Calistoga when she met defendant Nicholas Rae in approximately 1996. The only information about their early relationship comes from the transcript of a police interview with defendant after Johnson's death, in which he stated that he met Johnson when he did some work on her sprinkler system, and he moved into her home soon after they met. Until June of 2000, Johnson was able to walk around the house and yard. However, she could not see well, and shortly after defendant moved in he began to take care of writing checks and paying household bills. Defendant invited a friend, Joe Jessie Ramirez, to the house a few times a week to help with jobs around the house and with cooking and cleaning. Defendant paid Ramirez with Johnson's money. Ramirez had a prior felony conviction.

In mid-June of 2000, Johnson suffered from sciatic pain, possibly from a fall, and an impacted bowel. Over the course of what a physician stated was "a long period of time," defendant left her in a chair in her bedroom.

On June 25, 2000, Johnson tried to get out of the chair, and defendant noticed that she had developed sores on her back. He called 911. The responding police officer noted that the bedroom was dirty with a strong odor of urine, and there were flies in the house. Soiled linens were on the floor in the bedroom, and open containers of beer and soda were on the countertops, dresser, and nightstand. Johnson was taken to the St. Helena Hospital emergency room.

The nurse who attended her testified that Johnson's back and upper thighs and the back of her nightgown were covered in dried feces. When the nurse peeled the nightgown away a layer of skin came with it in some areas. Johnson had pressure sores,[1] and one sore in her perianal area had live maggots in it. The nurse testified that Johnson appeared emaciated and that her condition was one of the worst the nurse had ever seen.

Johnson stayed in the hospital overnight and on the following day, June 26, she was seen by the doctor. He noted that she was very thin and dehydrated. Johnson was discharged from the hospital that same day. On June 27, a home health care nurse from Adventist Home Health Care found Johnson in her bed at home, wearing a diaper that was wet with urine. The mattress and the dressing over the pressure sore in Johnson's coccyx area were also soaked with urine.

The home health care nurse asked defendant to get Johnson some diapers or Depends pads as soon as possible, and she rejected defendant's idea that he could use paper towels between Johnson's legs to keep her dry. She told defendant that she would order a hospital bed with an alternating pressure mattress, as Johnson's bed made providing care difficult and the hospital bed would help relieve pressure and help the sores to heal.

The nurse showed defendant how to change the sheets and how to move Johnson back and forth to keep the pressure off her sores; she stressed the importance of keeping a dry, clean dressing on the sore in the coccyx area. She also explained that getting Johnson out of bed was good for her circulation and would take weight off the pressure sores, and that feeding Johnson was important for wound healing and she should get three meals a day, plus snacks.

On June 28, a home health aide and a social worker from Adventist visited Johnson. Again, Johnson was soaked with urine, as was her bed, and there was nothing underneath her or in between her legs to absorb the urine. She had not been moved to the hospital bed. Defendant admitted that he was overwhelmed. The social worker believed that Johnson needed a nursing home and started trying to make arrangements for her to be placed.

During the social worker's visit, defendant had difficulty staying on the topic or working at problem solving. He told her that his father was one of

---

[1]The hospital attending physician testified that pressure sores (also called decubitus ulcers) are caused by pressure being exerted on an area of skin over a long period, and are consistent with long periods of sitting or lying down without moving.

the heads of the CIA and had had part of his brain taken out by the government because he had argued with President Kennedy over the Cuban missile crisis. This apparently delusional thinking gave the social worker cause for concern about whether defendant had the long-term ability to be Johnson's caregiver, and she made arrangements for another caregiver to stay the night. She planned to return herself the next morning to take Johnson to a nursing home—a plan to which she believed defendant had agreed by the time she left.

Another nurse visited in the afternoon and found conditions much the same. Johnson's bed was again wet with urine and she had paper towels between her legs. The nurse again advised defendant how to feed and care for Johnson.

A home health aide came to the house that evening with instructions to stay the night and care for Johnson. She stayed only a few minutes, because she became frightened when defendant yelled at her. Johnson was wet and smelled of urine, and Johnson told the aide that she really needed help, and that she was hungry and had not yet had lunch or dinner, although it was 5:30 p.m. There was no food in the refrigerator.

The following day, June 29, the social worker and the home health care nurse went together to the house to speak to Johnson about placement in a skilled nursing facility. Everything was set up for her admission; all she needed to do was agree. They found Johnson still in her own bed in the bedroom, not in the hospital bed, with paper towels between her legs. Defendant had removed the bandage on the wound on her coccyx, saying that the wound needed open air, and he insisted that the nurse was wrong in saying that the wound needed a bandage.

The social worker and the nurse discussed the skilled nursing facility with Johnson, who at first said "no, no, no," but then began to listen when they told her that she would receive physical therapy and it would help her to become strong enough to walk again. When it seemed that Johnson was considering going, defendant ran into the room from his room, where he had been listening, and yelled at Johnson not to go, at which point she said, "I guess I can't go then." Defendant became extremely agitated and angry, and eventually the social worker and the nurse left, believing it was unsafe for them to stay.

Over the next few days adult protective services (APS) workers attempted to find in-home caregivers to assist with Johnson's care, and to persuade her to go to a nursing home. At first, defendant was cooperative with the attempt

to find other caregivers, but then he became angry and agitated, refused any more help, cursed at the APS workers, and left hostile voicemail messages for them. He did not move Johnson to the hospital bed and insisted her sores were healing and that he did not need help. He refused to allow APS workers to talk to Johnson unless he was listening in on the call.

Defendant called police on the evening of July 6 to say that Johnson had died. The cause of death was bilateral pulmonary emboli, which may be caused by inactivity. When police arrived a cloth was wrapped around her lower body and a towel was inserted into her vaginal area. The bed was soaked with urine and there was feces on the towel. In the bedroom, there was feces on the floor, a full package of Depends, rolls of paper towels, and a bag full of garbage. The bathroom and washer/dryer area were filthy.

Defendant was arrested on charges of violation of Penal Code sections 368, subdivision (b)(3), elder abuse, and 368, subdivision (c), embezzlement from an elder, occurring from June to July 6, 2000. The embezzlement charge was dropped before trial began, and the information filed December 27, 2000, charged defendant with violation of Penal Code section 368, subdivision (b)(1), based on events occurring between June 6 and July 6, 2000 (the charged period). After trial, the jury found defendant guilty of one count of endangering the person or health of an elder, Penal Code section 368, subdivision (b)(1).[2] In a bifurcated bench trial, the court found true the allegation that defendant had two prior felony convictions.

The trial court suspended imposition of sentence, placed defendant on five years' formal probation, imposed a restitution fine of $800, and as a term of probation ordered defendant to serve 365 days in Napa County Jail.

DISCUSSION*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[2]Penal Code section 368, subdivision (b)(1), provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult, with knowledge that he or she is an elder or a dependent adult, to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health is endangered, is punishable by imprisonment in a county jail not exceeding one year, or by a fine not to exceed six thousand dollars ($6,000), or by both that fine and imprisonment, or in the state prison for two, three, or four years."

*See footnote, *ante,* page 116.

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. *The Trial Court Did Not Err in Refusing to Give CALJIC No. 17.01 Regarding Unanimity*

Defendant argues that the trial court committed prejudicial error when it refused to instruct the jury on unanimity pursuant to CALJIC No. 17.01.[6] The court refused defendant's request to give the instruction, stating "there may be multiple legal elements contained in the particular charges in question, but there could be a continuing course of conduct on the evidence. So I don't think 17.01 is appropriate." We agree, and hold there was no error.

The unanimity instruction is not required where the criminal acts are so closely connected that they form a single transaction or where the offense itself consists of a continuous course of conduct. (See *People v. Diedrich* (1982) 31 Cal.3d 263, 282 [182 Cal.Rptr. 354, 643 P.2d 971].) Offenses which are continuous in nature include the failure to provide for a minor child, child abuse, contributing to the delinquency of a minor, and animal cruelty. (*People v. Sanchez* (2001) 94 Cal.App.4th 622, 631, 633 [114 Cal.Rptr.2d 437] (*Sanchez*).)

Because the language of Penal Code section 368, subdivision (b)(1) (formerly subd. (a)) derives from the felony child abuse statute, Penal Code section 273a, it is appropriate to review the decisions interpreting section 273a in our analysis of section 368, subdivision (b)(1). (*People v. Heitzman* (1994) 9 Cal.4th 189, 204-205 [37 Cal.Rptr.2d 236, 886 P.2d 1229]; *People v. Sargent* (1999) 19 Cal.4th 1206, 1216, fn. 6 [81 Cal.Rptr.2d 835, 970 P.2d 409].)

In *People v. Ewing* (1977) 72 Cal.App.3d 714 [140 Cal.Rptr. 299], the defendant was convicted of felony child abuse under circumstances likely to produce great bodily harm or death. (Pen. Code, § 273a; *Ewing, supra,* 72

---

*See footnote, *ante*, page 116.

[6]CALJIC No. 17.01 reads as follows: "The defendant is accused of having committed the crime of _____ [in Count ____]. The prosecution has introduced evidence for the purpose of showing that there is more than one [act] [or] [omission] upon which a conviction [on Count ____] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he][she] committed only one or more of the [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count ____], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."

Cal.App.3d at p. 716.) He challenged his conviction on the basis that the trial court failed to instruct the jury pursuant to CALJIC No. 17.01. The Third District held that Penal Code section 273a is a statute that may be violated by a continuous course of conduct or by a series of acts over a period of time. (*Ewing*, at p. 717.) The court noted that although the child abuse statute may be violated by a single act, it is more commonly applied to "repetitive or continuous conduct. [Citations.] Here, the information alleged a course of conduct in statutory terms which had occurred between two designated dates. The issue before the jury was whether the accused was guilty of the course of conduct, not whether he had committed a particular act on a particular day." The court concluded the continuous course of conduct exception applied. (*Ibid.*) The same is true in the case before us.

Our conclusion that Penal Code section 368 may be violated by a continuous course of conduct is further supported by an examination of the statutory language at issue in order " 'to determine whether the Legislature intended to punish individual acts or entire wrongful courses of conduct.' " (*People v. Avina* (1993) 14 Cal.App.4th 1303, 1310 [18 Cal.Rptr.2d 511] [unanimity instruction not required where resident child molester statute expressly states it is to be treated as a continuous-course-of-conduct crime].) When the language of the statute focuses on the goal or effect of the prohibited crime, the offense is a continuing one. (*Sanchez, supra,* 94 Cal.App.4th at p. 632.) The elder abuse statute provides for penalties for anyone who "willfully causes or permits any elder or dependent adult . . . to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or . . . willfully causes or permits the person or health of the elder or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health is endangered . . . ." (Pen. Code, § 368, subd (b)(1).) The statute is focused on the effect of the crime on the victim: unjustifiable physical pain or mental suffering.

A continuing course of conduct has been held to exist where the wrongful acts were successive, compounding, and interrelated. (*Sanchez, supra,* 94 Cal.App.4th at p. 632; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 275 [107 Cal.Rptr.2d 160]; see *People v. Avina, supra,* 14 Cal.App.4th at p. 1311.) In the context of elder abuse, malnourishment and dehydration, festering bedsores, bowel impaction and unsanitary and unhealthy living conditions are the result of continuous neglect and failures of appropriate care, rather than one single act or omission. The wrongful acts were successive, compounding, and interrelated.

Defendant argues that because there was evidence of two separate events, one before and one after Johnson's hospitalization in late June, a unanimity

instruction was required. We disagree. A continuous course of conduct, by its nature, may stop and start, and the two-day period during which defendant did not have charge of Johnson's care did not interrupt his course of conduct. A close temporal connection is not required where the continuous course of conduct exception is implicated. (*People v. Avina, supra,* 14 Cal.App.4th at p. 1309.) Johnson's suffering did not cease when she went into the hospital and then resume when she came home to defendant's care. Her suffering, magnified by her helplessness and enforced isolation from other people, continued unabated.

On the facts of this case, defendant's failure to provide Johnson with appropriate nutrition, to help her to move when she was unable to move herself, to clean her when she was incontinent, and to cooperate with health care workers and caregivers attempting to assist him in providing necessary care, as well as his failure to provide adequate care by refusing to use the hospital bed and refusing to adhere to the instructions of the health care workers who came to the home, constituted a continuing course of conduct. A unanimity instruction was not required. The trial court's refusal to instruct the jury pursuant to CALJIC No. 17.01 was not error.

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied October 9, 2002, and the nonpublished portion of the opinion was modified. Appellant's petition for review by the Supreme Court was denied November 26, 2002.

---

*See footnote, *ante,* page 116.