Filed 6/14/13  P. v. Fousek CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037696 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS101585) |
| v. | |
| PATRICK FOUSEK, | |
| Defendant and Appellant. | |

A jury convicted defendant Patrick Fousek of felony child endangerment (Pen. Code, § 273a, subd. (a))[1] and misdemeanor possession of drug paraphernalia (Health & Saf. Code, § 11364) but deadlocked on a third count, misdemeanor using or being under the influence of a controlled substance (Health & Saf. Code, §11550, subd. (a)).  The trial court declared a mistrial on that count and sentenced defendant to six years in prison.

On appeal, defendant contends that (1) the evidence was insufficient to support his child endangerment conviction, and (2) the trial court prejudicially erred in failing to give a unanimity instruction with respect to that count.  We agree with defendant's second contention and reverse the judgment.

---

[1]     Further statutory references are to the Penal Code unless otherwise noted.

# I. Background

As Virginia Pena and Natasha Andrews were walking into a Salinas Walmart on June 22, 2010, a man with a baby in his shopping cart asked to borrow a phone to call his ride. The man was defendant, and neither woman had ever seen him before. Andrews gave him her phone, and when he returned it, the women complimented and asked to hold the baby. Defendant handed the baby to Pena, "said we can have her for $25," and "took off on his cart and said bye." Pena and Andrews "stayed there watching to see if he was going to come back. And he didn't. He went directly to the car" that had stopped to pick him up.

The women followed defendant, and he repeated the offer. As they approached the car, the driver "put a [higher] price on the baby." Pena "knew the situation was bad for the baby, and [she] wanted to call the cops to get the baby away," so she told defendant she would go to the bank. She handed the baby to him, and as the car drove off, she wrote down the license plate number. She called 911.

Salinas Police Officer Edwin Cruz responded to the call, traced the license plate number, and went to the apartment defendant shared with his girlfriend Samantha Tomasini and their eight-month-old daughter. Denying they had been at Walmart, defendant led Cruz into the bedroom. "[T]here wasn't much illumination in . . . the apartment," and Cruz did not want to wake the baby, who "seemed to be fine." When he asked again what happened at Walmart, "they [told him] it was a big joke." Cruz cautioned them about jokes like that and left. He was in the apartment "[l]ess than 10 minutes."

Officer Joel Anaya and his partner responded to a report of a domestic disturbance at the same apartment around 1:00 a.m., and Cruz and other officers arrived soon after. When Tomasini opened the door, Anaya saw "a small child in like a baby walker wandering around in the living room," crying. It was "unusual" to see "a small child up at that time of night and the parents up as if it was a normal afternoon," and the condition

2

of the apartment heightened Anaya's concern for the baby. It "just looked like a complete mess." Stale marshmallows littered the living room floor, and a "foul odor" came from the "filthy" kitchen. Dirty dishes were piled in the sink and on the counters, food was left out, and the floor was sticky. It was cold outside, but a sliding glass door was open, creating a breeze in the apartment.

Anaya believed defendant and Tomasini were under the influence of a stimulant. Tomasini was belligerent and fidgety, her speech was "very rapid," her pupils were dilated, and her fingertips were burnt. Defendant was sweaty, his pupils were even more dilated than Tomasini's, his fingertips were burnt, and he had "a white discoloration of his tongue," all signs consistent with methamphetamine use. He told police a methamphetamine pipe found in the bedroom was his, and he admitted having used the drug several months before but claimed "he didn't do that anymore."

Police arrested defendant and Tomasini and took the baby into protective custody. Defendant refused to submit to a urine test.

In a videotaped interview, Tomasini told police that she and defendant smoked methamphetamine "maybe a couple . . . times a week" in their apartment with friends and neighbors in June 2010. The baby was there "most of the time." Tomasini and defendant "would . . . go in the bathroom . . . and take turns goin' in there and smoking . . . ." They did not need to buy drugs because people would "come and smoke us out, man, they, they've been coming and smoking us out." She said she had smoked methamphetamine three or four days before the interview. She and defendant were "not in the right mind space" to give the baby attention when they were high. Although the baby was eating solid food, Tomasini was still breastfeeding her "in the morning and at night and at naptime."

The prosecution called Tomasini to testify at trial, and the videotaped interview was played for the jury. Tomasini claimed not to remember anything she said in the

3

interview, when she had been "really high." She lied in the interview, but some of what she said was true.

Tomasini told the jury she did not want defendant "to get in trouble." She was "the only one to blame," and the methamphetamine pipe found in the apartment was hers. Defendant "didn't use." When defendant "found out [she] was getting high" again, in late May or early June 2010, he told her to stop breastfeeding the baby. After that, "[t]he only time I would breastfeed is when I was not in his presence, . . . like at nighttime when I was getting her to bed" and "[m]aybe sometimes" in the morning. Tomasini claimed defendant never saw her smoke methamphetamine and did not know she was still breastfeeding. "He would be in the living room, and I would be in the bedroom."

Pena and Andrews described defendant's offer to sell the baby, and a surveillance video of the Walmart parking lot was played for the jury. Pena did not think defendant was joking when he offered to sell the baby for $25. She sensed something was wrong, and she was "scared" for the baby. "[Y]ou walk up to somebody you don't know, you don't know what they're capable of doing. You sell your baby, they accept it, anything could happen to that baby." Andrews testified that defendant's offer confused her, "[b]ecause normal people don't do that." She thought defendant was joking at first, but when he repeated the offer, "I didn't think [he] was joking after that." She did not believe the driver of the car was joking when he raised the price to $75.

Dr. Valerie Barnes, the director of pediatric services at Natividad Medical Center in Monterey, testified as an expert in child abuse. She explained that methamphetamine is a highly addictive central nervous system stimulant with a long half-life. It readily enters breast milk, is always present in the breast milk of chronic users, and can be detected in the breast milk of non-chronic users for 48 hours after a single use. The drug passes to a child through the mother's milk, and babies can also ingest it through their lungs.

4

Dr. Barnes explained that babies exposed to methamphetamine "don't grow well . . . . They don't sleep well. They are not cuddly babies. . . . [¶] It is very difficult to settle them down." "You often find these are babies that . . . the parents let . . . stay up to midnight or one in the morning till they fall asleep just from sheer exhaustion." A potential for seizures and strokes exists. As they get older, "[t]hese children have learning difficulties . . . . They don't remember things and they are clumsy because their visual motor skills are very poor . . . . [T]heir social skills are really poor," and "[t]hey can become psychotic . . . ." "The brain is permanently damaged." Dr. Barnes opined that a baby breastfed by a mother who uses methamphetamine even once a week has a "high" probability of being seriously injured. "The child is not growing properly, [the] brain is not developing properly, so they are damaged for life . . . . It's very serious."

Even if a baby is not being breastfed, it is still endangered by environmental factors in the home and by being neglected. Children of methamphetamine users not only ingest methamphetamine through their lungs, but the smoke itself "damages the lungs and the airways." Children of methamphetamine users "frequently don't get fed properly," their diets are "very erratic," and their homes are "usually filthy," with cockroaches and even rats, which bring disease. The children's "skin breaks down very easily and they get infections."

Vincent Call, defendant's next-door neighbor for almost a year, said a "persistent" odor of methamphetamine and leftover food came from defendant's apartment. Call also heard loud arguing "a lot" at random times of the day and night—"I mean, up all the time." He detected a "[f]ainter" methamphetamine odor outside defendant's upstairs neighbor's door but not in other parts of the apartment complex.

Defendant's upstairs neighbor, Christopher Jones, recognized an odor coming through the vents into his apartment that smelled "as if someone was cooking [methamphetamine], or . . . making their own batch or mixing the chemicals for it." The odor was "pretty regular," beginning in the middle of May 2010, and it went away when

5

defendant and Tomasini moved out. Jones saw Tomasini smoking methamphetamine by the dumpster in June 2010, and he heard defendant tell her, "We're supposed to share that shit."

The defense called only one witness, officer Anthony Garcia, who interviewed Pena and Andrews on June 23, 2010. Garcia testified that Pena told him defendant "offered to sell the baby twice for $25, and then said he was just kidding and proceeded to ask to sell the baby for $75."

Each side requested a unanimity instruction. After unreported discussions in chambers, the trial court stated on the record that "[t]he court is not giving either 3500 or 3501. Both of those misstate the law according to [*People v. Vargas* (1988) 204 Cal.App.3d 1455]."

"Let me talk about the continuing course of conduct here," the prosecutor told the jury in closing argument. "You actually don't have to agree when it comes to child endangerment as to every single event. Let me put it to you this way, if you think that the Walmart event is sufficient to convict him of the greater offense and maybe some of you think that the conditions of the home are sufficient to convict him of the greater offense, that's okay. Convict him. You can write guilty. You don't have to all agree as to what causes the child endangerment, the endangerment that's likely to cause serious bodily injury. Just that there are facts where you can find that. It's a very unique statute in that sense. [¶] Some of you may think all of it together constitutes endangerment sufficient for the greater offense, and that's okay too. You have a lot of facts here. And if you find any of those facts sufficient to constitute endangerment, you believe [the baby] was in such a condition that her health was endangered, serious bodily injury or death[,] and that the defendant caused or permitted it, find him guilty."

After deliberating six hours, the jury reported it was deadlocked on the Health and Safety Code section 11550 count, and the trial court declared a mistrial on that count. The jury returned guilty verdicts on the child endangerment and paraphernalia possession

6

counts.  The Health and Safety Code section 11550 count was dismissed on the prosecution's motion, and defendant was sentenced to an aggregate six-year prison term. He filed a timely notice of appeal.

## II.  Discussion
### A.  Sufficiency of the Evidence

Defendant contends that there was insufficient evidence to support his conviction for felony child endangerment.  We disagree.

When a defendant challenges the sufficiency of the evidence to support a conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.]  In conducting such a review, we ' "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citations.]  'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

"Section 273a, subdivision (a) 'is an omnibus statute that proscribes . . . four branches of conduct.' " (*People v. Valdez* (2002) 27 Cal.4th 778, 783 (*Valdez*).) Defendant was prosecuted under the fourth branch, which provides in pertinent part that "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, . . . having the care or custody of any child . . . willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered,

7

shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years." (§ 273a, subd. (a).)

"Violation of section 273a, subdivision (a) ' "can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect." [Citation.]' " (*Valdez*, *supra*, 27 Cal.4th at p. 784.) The statute can be violated by a single act or by a repetitious and continuous course of conduct. (*People v. Vargas* (1988) 204 Cal.App.3d 1455, 1461 (*Vargas*).) " '[T]wo threshold considerations . . . govern all types of conduct prohibited by this law: first, the conduct must be willful; second, it must be committed "under circumstances or conditions likely to produce great bodily harm or death." [Citation.]' " (*People v. Sargent* (1999) 19 Cal.4th 1206, 1216.) " ' "The word "willfully," when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate [the] law, or to injure another, or to acquire any advantage.' [Citation.]" (*Valdez*, *supra*, 27 Cal.4th at pp. 787-788.)

"[C]riminal negligence is the appropriate standard" in cases involving indirect infliction of harm. (*Valdez*, *supra*, 27 Cal.4th at p. 781; see CALCRIM No. 821.) "[C]riminal negligence involves ' "a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences." ' [Citation.]" (*Valdez*, at p. 788.) " 'Under the criminal negligence standard, knowledge of the risk is determined by an objective test: "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' [Citations.]" (*Id*. at p. 783.)

8

Defendant contends there was no evidence that the baby's living conditions were "likely to produce great bodily harm or death." It was not shown that the methamphetamine pipe was within the baby's reach, he argues, and no illegal drugs or toxic or flammable chemicals were found in the apartment, which was merely "messy." We cannot agree with his assessment of the evidence.

The photographs that the jury viewed showed that the apartment was more than "messy." They depict a scene of complete disarray, with trash on the floor, dirty dishes piled in the sink and on the counters, crumpled napkins tossed on the stove burners, and clothes and other items, including small things a toddler could choke on, strewn everywhere. Anaya testified that a "foul odor" came from the "filthy" kitchen; Cruz called it "a very bad stench." Anaya found a sliding door to the outside left open at 1:00 a.m. The jury could reasonably have concluded that these conditions posed serious risks to a toddler, especially one who was up at all hours, mobile, and "grabbing things."

The baby's living conditions posed an even more significant risk—one that defendant's assessment of the evidence ignores. Tomasini testified that she and defendant were smoking methamphetamine in their apartment with friends and neighbors "maybe a couple, couple times a week" during June 2010. The baby was present "most of the time." A user exhales smoke, Tomasini explained, and "it's dense, you know, if it's good shit." Although she claimed the bathroom door was "always closed after" and that she "did not smoke near [the baby] ever," the jury could reasonably have concluded that the baby was exposed to methamphetamine smoke or fumes that seeped under the closed bathroom door or wafted into the rest of the apartment as multiple users went in and out of the bathroom. The apartment was small, and enough smoke was generated that defendant's next door and upstairs neighbors both noticed an odor of methamphetamine coming from defendant's apartment. Jones said the odor was "pretty regular" in June 2010, and Call described it as "persistent."

9

Dr. Barnes testified that babies can ingest methamphetamine through their lungs, and she described the many problems that babies exposed to methamphetamine suffer. They have learning difficulties, their social skills are "really poor," and "[t]hey can become psychotic." Their brains do not develop properly, "so they are damaged for life . . . . It's very serious." In our view, evidence of the baby's exposure to methamphetamine smoke was itself sufficient to support a finding that she was likely to suffer great bodily harm.

There was also evidence that the baby was ingesting methamphetamine-tainted breast milk, and that evidence provided further support for a finding that she was likely to suffer great bodily harm from the environment in which defendant willfully placed her. Dr. Barnes testified that methamphetamine is passed to a baby in breast milk. Tomasini was breastfeeding the baby at least once and as often as three times a day in June 2010. During the same period, Tomasini "got high all over the place"—not only in her apartment, but also at "the neighbor's" and with friends who lived nearby.

Defendant concedes the sufficiency of the evidence to support findings that he knew Tomasini had resumed using methamphetamine and "that a mother who breastfeeds a baby after smoking methamphetamine, is likely to produce great bodily harm." He maintains, however, that there was insufficient evidence "that a reasonable person in [his] position *would have known* that [Tomasini] *was breastfeeding* their baby." We disagree.

Tomasini told the jury she had breastfed the baby from birth. The jury could infer from Romnie Gross's testimony that defendant knew Tomasini was still breastfeeding the baby in April 2010, because he was "no more than [a]n arm's length away" and "just standing there" when Tomasini told Gross in an "audible" voice that she was breastfeeding the baby. Tomasini claimed, however, that in late May or early June 2010, defendant told her to stop breastfeeding and that after that, she never did so in his presence. "He would be in the living room, and I would be in the bedroom."

10

The jury could reasonably have disbelieved this assertion. Tomasini testified that she did not want defendant "to get in trouble . . . ." She and defendant were both unemployed and spent a lot of time at home with the baby. The apartment was small, and the three shared the same bed. Given the small space, the amount of time they spent together, the thrice-a-day feedings, Tomasini's testimony that the baby "didn't really like the change" to baby formula, and her further testimony that breastfeeding was "the only way" to get the baby to sleep, the jury could reasonably have concluded that defendant knew, or should have known, that Tomasini was still breastfeeding the baby even after he asked her to stop.

Defendant argues, however, that there were no telltale signs to alert him to the continued exposure—"no evidence that [the] baby was exhibiting any of the 'symptoms' that Dr. Barnes described . . . ." The record belies this assertion. Dr. Barnes explained that babies exposed to methamphetamine "don't sleep well" and are "very difficult to settle . . . down." Tomasini testified that the baby "had her own sleep schedule." She was not "sleepy a lot"—instead, "[s]he was more active." Breastfeeding was "the only way" to get her to sleep. Anaya found the baby up at almost one in the morning, crying as she "wander[ed] around" in a baby walker. Call reported seeing Tomasini on late night cigarette breaks with "[a] cigarette in one hand, the baby in the other. [A] barely clothed child *at two a.m. . . .* " (Italics added.) All of these signs should have alerted defendant that the baby was ingesting methamphetamine even after he asked Tomasini to stop breastfeeding her. Substantial evidence supported jury findings that defendant willfully permitted the baby not only to inhale but also to ingest methamphetamine, and that he acted with criminal negligence in doing so. We conclude that there was more than sufficient evidence to support a jury finding that the living conditions in which defendant willfully placed his baby were likely to produce great bodily harm and that he acted with criminal negligence in subjecting her to those conditions. Substantial evidence thus supported his conviction for child endangerment.

11

Evidence of the Walmart incident was, in our view, independently sufficient to support defendant's conviction. Pena and Andrews were complete strangers. Defendant did not ask their names or attempt to learn anything about either of them. He simply handed the baby to Pena, said she could "have her for $25," and without a backward glance, "took off on his cart and said bye." His counsel argued at trial that defendant was only joking and that defendant told the women that, but neither recalled him doing so, and both took him seriously; in fact, after the car drove off, they went into the Walmart to ask if anyone had reported a baby missing. Garcia conceded on cross-examination that Pena had told him defendant's intent to sell the child was clear, because "if it's a joke, you're not going to keep on asking to get a different reaction." The jury could reasonably have concluded from this evidence that by offering the baby for sale, defendant willfully put her in a dangerous position under circumstances likely to produce great bodily harm, and that his actions amounted to criminal negligence.

Defendant argues, however, that the baby was never in any danger, because his offer was not accepted. The argument lacks merit. Actual harm is not an element of the section 273a offense; "[i]t is the likelihood of foreseeable injury, rather than whether such injury in fact occurs, that is relevant." (*People v. Lee* (1991) 234 Cal.App.3d 1214, 1220.) Nor can defendant rely on Pena's trial testimony "that [she and Andrews] posed no danger to the baby." The statute focuses on the circumstances that existed when the crime was committed. (§ 273a, subd. (a).) When defendant offered his baby for sale, he knew nothing about Pena or Andrews. He had no way of knowing that they were "peaceful and kind people . . . ." As Pena told the jury, "[W]ho walks up to a stranger and says you want to buy my baby for $25? I mean, I could'a been a psycho killer or anything. No one does that. I wouldn't do that with my kids." "[A]nything could happen to that baby." Evidence that defendant offered to sell his baby to complete strangers, gave her to them, and immediately walked away was independently sufficient to support his conviction for child endangerment.

12

## B. Instructional Error

Defendant contends that the trial court's failure to give a unanimity instruction requires reversal. We agree.

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679 (*Jennings*), citing *People v. Diedrich* (1982) 31 Cal.3d 263, 281.) However, "no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time' [citation]." (*Jennings*, at p. 679; *People v. Napoles* (2002) 104 Cal.App.4th 108, 114 (*Napoles*).) " ' "This second category of the continuous course of conduct exception has been applied to a limited number of varying crimes, including . . . child abuse [citation]." [Citation.]' [Citation.]" (*Napoles*, at p. 115.)

"Of course, child abuse is not invariably charged as a course of conduct offense; one act or omission constituting abuse may be sufficient for conviction." (*Napoles*, *supra*, 104 Cal.App.4th at p. 116; see *People v. Villalobos* (1962) 208 Cal.App.2d 321, 326.) When a case involves more than one course of conduct, or a course of conduct and one or more discrete acts, each sufficient to constitute a violation of the relevant statute, a unanimity instruction must be given. (E.g., *People v. Moore* (1986) 185 Cal.App.3d 1005, 1016 (*Moore*); *People v. Epps* (1981) 122 Cal.App.3d 691, 703-704.)

"The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors

13

believed [him] guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*People v. Russo* (2001) 25 Cal.4th 1124, 1134-1135 (*Russo*).)

We review de novo a claim that the trial court failed to properly instruct the jury on the applicable principles of law. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

Defendant contends that a unanimity instruction was required here because "the prosecutor presented the jurors with three discrete events or circumstances"—offering to sell the baby at Walmart, causing or permitting a dangerous environment in the apartment, and permitting the baby to ingest methamphetamine-tainted breast milk. The Attorney General disagrees, asserting that the information alleged "only one count of child endangerment based on [defendant's] course of conduct toward his daughter." Defendant's offer to sell the baby at Walmart, she argues, was just another act "consistent with a course of conduct of dangerous neglect." We do not agree with either side's characterization of the evidence, but we agree with defendant that a unanimity instruction was required.

Cases decided under section 273a and analogous continuing course of conduct statutes[2] help to define the parameters of a "course of conduct." (*Vargas*, *supra*, 204

---

[2]     See *People v. Avina* (1993) 14 Cal.App.4th 1303, 1309 [" 'This second category of the continuous course of conduct exception has been applied to a limited number of varying crimes, including pimping . . . , pandering . . . , failure to provide for a minor

Cal.App.3d at p. 1464.) The two-and-a-half-year-old victim in *Vargas* suffered "burns, bruises, contusions, whipping injuries, and bites inflicted within a mere *10-day period*." (*Id.* at p. 1462.) The court held that where the evidence established "a pattern of physical trauma inflicted upon a child within a relatively short period of time, *a single course of conduct is involved* and no justification exists for departing from the well-established rule . . . that jury unanimity is not required as to the underlying conduct constituting the violation of section 273a." (*Id.* at p. 1464.) "That a single set of circumstances may have established criminal culpability under different legal theories [e.g., direct infliction of abuse or permitting the child's health or safety to be endangered] does not mean more than one course of conduct was involved." (*Ibid.*)

In *People v. Rae* (2002) 102 Cal.App.4th 116 (*Rae*), the court observed that "[a] continuing course of conduct has been held to exist where the wrongful acts were successive, compounding, and interrelated." (*Id.* at p. 123.) Applying that definition in the context of elder abuse, the court held that "malnourishment and dehydration, festering bedsores, bowel impaction and unsanitary and unhealthy living conditions are the result of continuous neglect and failures of appropriate care, rather than one single act or omission." (*Ibid.*)

The evidence disclosed two separate courses of conduct in *Moore*, establishing that the defendant repeatedly exposed himself to five different girls under the age of 14 and also lifted some of their shirts and "listened to [their] heartbeat[s]" with a stethoscope. (*Moore*, *supra*, 185 Cal.App.3d at p. 1010.) The court held that "[d]efendant's repeatedly exposing himself to the victims clearly constituted a single course of conduct as to the particular victim involved." (*Id.* at p. 1016.) Assuming that

_____

child . . . , contributing to the delinquency of a minor . . . and child abuse . . . .' [¶] To this exemplary list could be added spousal battery . . . , annoying or molesting a child . . . , acting as accessory to a felony . . . and dissuading a witness from testifying . . . ." (Citations omitted.)]

15

the stethoscope-touching evidence "was sufficient in itself to constitute a violation of section 647a," however, "a unanimity instruction should have been given," although the failure to do so was harmless on the facts of that case. (*Ibid.*)

Considering the evidence presented here in light of the above cases, we conclude that it disclosed a continuing course of conduct and a discrete act, either of which would have supported defendant's conviction under section 273a. The continuing course of conduct was defendant's causing or permitting a dangerous environment in the apartment by directly exposing the baby to methamphetamine smoke, permitting Tomasini and others to do the same, permitting Tomasini, while using methamphetamine, to breastfeed the baby, and generally causing or permitting the baby to live in chaotic and unhealthful conditions. Like the defendant's actions and omissions in *Rae*, defendant's actions and omissions in this regard were "successive, compounding, and interrelated" during the month of June 2010. (*Rae*, *supra*, 102 Cal.App.4th at p. 123.)

Defendant's offer to sell the baby, while closely related in time, was in our view too dissimilar in kind to be part of the above-described course of conduct. It was a one-time occurrence—a discrete act that was sufficient in itself to support defendant's conviction under section 273a. The evidence therefore disclosed two bases for convicting defendant of the single section 273a charge. This posed "a risk the jury may [have] divide[d] on two discrete crimes and not agree[d] on any particular crime." (*Russo*, *supra*, 25 Cal.4th at pp. 1134-1135.) A unanimity instruction was required, and the trial court erred in failing to give one. (*People v. Sanchez* (2001) 94 Cal.App.4th 622, 634; *Moore*, *supra*, 185 Cal.App.3d at p. 1016.)

Defendant contends that the error was prejudicial. There is a split of authority on whether the state law harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 or the federal constitutional standard articulated in *Chapman v. California* (1967) 386 U.S. 18 applies to the erroneous failure to instruct on unanimity. (See *People*

16

*v. Wolfe* (2003) 114 Cal.App.4th 177, 185-186.) We conclude that the error here was prejudicial under either standard.

"This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*Russo*, *supra*, 25 Cal.4th at p. 1132.) It is " 'designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* to convict on one count.' [Citation.]" (*Ibid*.) "The erroneous failure to give a unanimity instruction is harmless if disagreement among the jurors concerning the different specific acts proved is not reasonably possible." (*Napoles*, *supra*, 104 Cal.App.4th at p. 119.) We cannot conclude that disagreement was not reasonably possible here. Three reasons support our conclusion.

First, the jury was not alerted at the start of trial that defendant was charged with a continuing course of conduct. The charging document did not allege a continuing course of conduct "in 'statutory terms which had occurred between two designated dates.' " (*Rae*, *supra*, 102 Cal.App.4th at p. 123.) Instead, it referred to conduct "on or about June 22, 2010," which, while broad enough to encompass conduct occurring on more than a single date, did not clearly inform the jury the a continuing course of conduct was at issue. (Compare *Napoles*, *supra*, 104 Cal.App.4th at p. 117 [allegation in statutory terms "alerts the jury that the charge consists of a continuous course of conduct, to be proved by evidence of more than one individual act. Thus, from the trial's inception, the jury was aware that this was not a case where one illegal act is charged and several are proven."].)

Nor did the prosecutor make it clear in his opening argument that a continuing course of conduct was involved. On the contrary, he told the jury that "[t]he evidence is going to show that the defendant is guilty of child abuse likely to produce great bodily

harm. You've got the instant [*sic*] of Walmart. You've got the living conditions. The evidence is going to show that the mom was breast-feeding while using meth and that Patrick Fousek is high on methamphetamine while watching the baby. [¶] Keep in mind, you don't need all of these theories. You'll learn later that one theory is independent from another. You can pick one, choose one or agree to all, and we'll get into that later. [¶] But there is [*sic*] going to be several events here that in your mind you're going to have to ask yourself is that endangerment and can that lead to serious bodily injury?" That the prosecutor labeled these different factual events "theories" did not, in our view, signal that a continuing course of conduct was at issue.

Second, as previously discussed, the evidence was not consistent with a single continuing course of conduct but instead disclosed a continuing course of conduct and a discrete act, either of which would have supported a conviction under section 273a.

Finally, the prosecutor affirmatively invited disagreement in his closing argument. "Let me put it to you this way," he told the jury, "if you think that the Walmart event is sufficient to convict him of the greater offense and maybe some of you think that the conditions of the home are sufficient to convict him of the greater offense, that's okay. Convict him. You can write guilty. You don't have to all agree as to what causes the child endangerment, the endangerment that's likely to cause serious bodily injury. . . . [¶] Some of you may think all of it together constitutes endangerment sufficient for the greater offense, and that's okay too. You have a lot of facts here. And if you find any of those facts sufficient to constitute endangerment, you believe [the baby] was in such a condition that her health was endangered, serious bodily injury or death[,] and that the defendant caused or permitted it, find him guilty." Later in his closing argument, the prosecutor told the jurors that they could find defendant guilty "on [the Walmart incident] alone or consider it with all of the other evidence for child endangerment or abuse likely to cause great bodily injury or death."

18

On this record, there was a reasonable possibility of a non-unanimous jury verdict. (See *Napoles*, *supra*, 104 Cal.App.4th at pp. 118-120 [reasonable possibility of non-unanimous jury verdict created by erroneous giving of "non-unanimity instruction," which " 'unpackaged' the course of conduct by informing the jurors that the defendants could be convicted for a *single* act (or omission), and then informed them that unanimous agreement on the specific act or omission found unlawful was unnecessary."].) Here, some jurors could have credited defendant's statement to Cruz and concluded, as defense counsel argued, that defendant's offer to sell the baby was nothing but "a stupid inappropriate joke." Rejecting the Walmart incident as a basis for a guilty verdict, those jurors could have based their verdicts solely on evidence of the baby's living conditions. Other jurors, however, may have credited Tomasini's testimony that she and defendant did not smoke methamphetamine near the baby "ever" and that defendant did not know she was still breastfeeding. Those jurors may have rejected the baby's living conditions as a basis for a guilty verdict and instead based their verdicts solely on the Walmart incident. Of course it is possible that all 12 jurors agreed that defendant violated section 273a by offering the baby for sale at Walmart, or by causing or permitting a dangerous environment in the apartment, or by offering the baby for sale at Walmart *and* causing or permitting a dangerous environment in the apartment. But we have no way of knowing this; therefore, reversal is required. (*Russo*, *supra*, 25 Cal.4th at p. 1132.)

## III. Disposition

The judgment is reversed.

19

                                                 _____

                                                 Mihara, J.

WE CONCUR:

_____

Premo, Acting P. J.

_____

Márquez, J.