Filed 1/22/21  P. v. Jenkins CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B294747 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA467828) |
| v. | |
| JASMINE JENKINS, | |
| Defendant and Appellant. | |
| In re | B301638 |
| JASMINE JENKINS | (Los Angles County Super. Ct. No. BA467828) |
| on | |
| Habeas Corpus. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Lisa B. Lench, Judge. Affirmed.

Rudolph J. Alejo, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Paul S. Thies, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jasmine Jenkins appeals from her conviction for manslaughter, contending the trial court made instructional and evidentiary errors, and the prosecutor committed misconduct. We affirm. Jenkins also petitions for a writ of habeas corpus on the ground that the prosecution failed its obligation to provide the defense with material exculpatory evidence. We issued an order to show cause (OSC) on the issue, and now deny the petition and discharge the OSC.

## BACKGROUND

In the evening of January 19, 2018, Brittneeh Williams drove to Jenkins's apartment with Kassadi, Williams's young daughter, to allow Kassadi to visit her father, Kayuan Mitchell, Jenkins's current boyfriend. At the apartment, Williams and Mitchell got into a fight that resulted in Mitchell beating Williams and causing her to bleed from her forehead.

Jenkins arrived in her car, her young son by Mitchell in the backseat, and taunted Williams. Mitchell got in Jenkins's car and they drove away, but Williams, who had by now called her sister, Sade Williams, put Kassadi in the backseat and gave chase.

2

Being chased by Williams, who was driving erratically, Mitchell instructed Jenkins to pull into a gas station. Williams also pulled in, left her car to come over to Jenkins's car, and shouted at the other woman and possibly punched her through the open window. Mitchell exited Jenkins's car and tried to restrain Williams, but had difficulty doing so, in part because Jenkins continued to taunt Williams from her car.

After back and forth scuffles between Mitchell and Williams, Jenkins exited her car with a large kitchen knife and stabbed Williams three times, killing her just as Sade Williams arrived.

Before trial, Jenkins's counsel moved to admit hearsay statements made by Mitchell to police about the events at the gas station. The trial court provisionally denied the motion, but noted Jenkins could renew it during trial. Jenkins's counsel never renewed the motion.

At trial, Ajay Panchal, a deputy medical examiner for the Los Angeles County Coroner, testified that Williams suffered three stab wounds to her chest and abdomen, any one of which would have been fatal. Panchal opined that a person suffering these injuries could still stand up and run for a very short period of time.

The prosecution presented three security camera video recordings depicting the fight. Collectively, they revealed that the skirmish outside Jenkins's car between Williams on one side and Jenkins and Mitchell on the other lasted about a minute. It involved three discrete encounters between Jenkins and Williams, the first two occurring at the gas pumps and the last at a bus stop on the sidewalk. In the first, Williams was thrown violently to the ground by Mitchell, presumably to keep her away

from Jenkins. In the second, Williams popped up and charged Jenkins and attacked her, but was driven off and held by Mitchell at the bus stop. In the third encounter, as Williams was being restrained by Mitchell at the bus stop, Jenkins approached and attacked her. The poor quality and limited coverage of the videos makes it impossible to see when the stabbing occurred.

Sade Williams testified that Jenkins stabbed her sister while Mitchell held her in a bear hug.

A.V., a 10-year-old who was with her mother at the bus stop, testified that Jenkins followed Williams to the bus stop, took a six-inch knife from her back pocket, said, "This is gonna be real scary," and stabbed Williams. A.V. testified that Jenkins was smiling and angry, "like a psychopath."

Jenkins testified that when she exited her car and approached Williams, the other woman charged and started hitting her. In response, Jenkins waived her knife at Williams and backed up to get away, but then fell, with Williams falling on top of her. Jenkins testified variously that she stabbed Williams only once, stabbed her three times, and had no idea that she had stabbed her.

The prosecution argued Jenkins stabbed Williams during the first and possibly third encounters, but not the second. The defense theorized that Jenkins stabbed Williams only during the second encounter, to defend herself from the latter's attack.

A jury acquitted Jenkins of murder but convicted her of voluntary manslaughter, and the court sentenced her to 11 years in prison.

Jenkins appeals. She also petitions for a writ of habeas corpus on the ground that the prosecution failed to disclose before trial that in 2006 both Brittneeh and Sade Williams were

adjudicated in juvenile proceedings to have assaulted three women.

## DISCUSSION

### I. Appeal

Jenkins contends the trial court erred in excluding Mitchell's hearsay statements to police about the fight and in failing to give a unanimity instruction, and the prosecutor committed prejudicial misconduct.

### A. Mitchell's Hearsay Statements were Inadmissible

Mitchell refused to testify, but in a statement to police he described Williams as the primary aggressor in the fight with Jenkins. The trial court excluded the statement as inadmissible hearsay. Jenkins contends the court erred in excluding Mitchell's story because it constituted a statement against penal interest, which renders the hearsay admissible. We disagree.

Hearsay evidence is a statement made by a witness not testifying at the hearing and offered to prove the truth of the matter asserted. (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless an exception applies. (Evid. Code, § 1200, subd. (b).)

"Evidence of a statement . . . is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

We review a decision to admit or exclude evidence under the reasonable probability standard for prejudice. (*People v.*

*Watson* (1956) 46 Cal.2d 818, 836; *People v. Trujeque* (2015) 61 Cal.4th 227, 280.)

Because the issue here is whether Mitchell's statement subjected him to the risk of criminal liability, we will focus on the arguably inculpatory portions.

Mitchell told police the following: "I am trying to see what Brittneeh is doing. I'm talking to her. She's going off. . . . But I am trying to distract her so Jas can pull out of the driveway."

"I am telling Jas like -- [. . . ¶] so Brittneeh in the car, catch up to us, now she is like chasing us, but I am telling her there's kids in the car. I am telling Jasmine my son here, my daughter in there. Don't run from her. You don't have to act like we running. Pull into the gas station. So we pulled into the gas station."

"[I] hop out. I come right in the middle of the car. I said Brittneeh, what are you doing? Like you got Kassadi in there. I told you too like you doing all of this for no reason. . . . Brittneeh hops out of her car, run around the car to Jas right here. [I]t was so fast I couldn't even just grab her like so she couldn't throw a hit."

"When [Brittneeh punched Jasmine through the car window], I grabbed her from the back of her collar and yanked her back. [ . . . ¶] To break it up -- yeah, to yank her back, to break it off. When I yanked her back, she fell. I ran up in front of Brittneeh, and then I just grabbed her so couldn't move. [ . . . ¶ . . . ] So now by the time I'm bear hugging her, her sister pull up, [Sade], and she see me holding her, so I guess she think she running around, she think she was getting beat up. So as soon as [Sade] get about how close you guys are, I grab [Sade] too because

6

she was riled up too. So I grabbed her, and I'm holding them. I'm trying to calm them down."

"She fell back 'cause I -- yanked her back, and you know, it's backwards, so she fell down. [ . . .¶] But before she can get up, it wasn't Jas who I'm trying to calm down. It's Brittneeh. So before she can get up, I ran up to her and hugged her, like you know, bear hug. Not squeezing the life out of her, but just where she can't move. [. . . ¶] Right, and she trying to get away. She's trying to get back to Jas."

None of this was inculpatory, and the court acted within its discretion in excluding it as inadmissible hearsay.

Jenkins argues that Mitchell's admission that he "yanked" Williams could have subjected him to prosecution for assault. We disagree. The clear import of Mitchell's statement was that he intervened in a fight to save the combatants, and the trial court was well within its discretion in seeing it this way.

Jenkins argues exclusion of the evidence violated her due process rights. We disagree. (*People v. Brown* (2003) 31 Cal.4th 518, 545 [the "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights"].)

### B.     No Unanimity Instruction was Necessary

Jenkins argues the trial court prejudicially erred by refusing to give a unanimity instruction such as CALCRIM No. 3500, as the assault in this case involved three discrete acts of violence, and the jury might have failed to reach a unanimous verdict on any one of them. We disagree.

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than

7

one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.] For example, in *People v. Diedrich* [(1982)] 31 Cal.3d 263, the defendant was convicted of a single count of bribery, but the evidence showed two discrete bribes. We found the absence of a unanimity instruction reversible error because without it, some of the jurors may have believed the defendant guilty of one of the acts of bribery while other jurors believed him guilty of the other, resulting in no unanimous verdict that he was guilty of any specific bribe. [Citation.] 'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

No unanimity instruction is required "when the acts alleged are so closely connected as to form part of one transaction. [Citations.] The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)

Even where the evidence shows that more than one act could suffice for a conviction of a particular offense, a unanimity instruction is not always required. For example, when a single homicide is charged, "unanimity as to exactly how the crime was

8

committed is not required." (*People v. Russo, supra,* 25 Cal.4th at p. 1135.)

Here, Jenkins committed only one discrete crime: manslaughter, and was not entitled to a unanimous verdict as to the particular manner in which the manslaughter occurred. (See *People v. Pride* (1992) 3 Cal.4th 195, 249-250.) Because the evidence did not suggest two discrete manslaughters occurred, and raised only "the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime" (*People v. Russo, supra,* 25 Cal.4th at p. 1135), a unanimity instruction was not appropriate.

Jenkins argues that a unanimity instruction is required even if a crime can be portrayed as a continuous course of conduct, if "the record also reveals that defendant tendered a different defense to each alleged" act. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 574.) Without a unanimity instruction, she argues, six jurors could have found that he was perfectly justified during the second incident but not the first, while six other jurors could have found that the first incident never happened but convicted her after finding the second incident unjustified by perfect self-defense. In such a scenario, Jasmine would stand convicted based on the combined findings of two separate factions, each constituting only half the jury.

The argument is without merit because it is impossible to assign the stabbing to any discrete moment in which Jenkins could have acted in self-defense. The video evidence failed to depict the stabbing at all, and Jenkins's testimony was variable and nonspecific. Sade testified that the stabbing occurred when Mitchell held Williams in a bear hug. And A.V. testified it occurred after Mitchell had pushed Williams to the bus stop.

9

No reasonable juror could conclude, and Jenkins does not contend, that Jenkins could have stabbed Williams in self-defense while she was under Mitchell's control. Either Jenkins stabbed Williams while Mitchell restrained her, or she stabbed her as part of one continuous transaction—the fight. Either way, no unanimity instruction was required, and the trial court acted within its discretion in declining to give one.

## C. There was No Prosecutorial Misconduct

After she killed Williams but before she was arrested, Jenkins made several statements on Instagram about the fight. In them, she bragged about her role and prowess. The statements were inconsistent with Jenkins's trial testimony, where she portrayed Williams as a serious threat.

During closing argument, the prosecutor commented on the discrepancy. She said, "This is how she's talking about the incident weeks later where someone is dead. 'The bitch tried to run up on my window again. I hopped out.' She tried to run up on my window again. What does she testify to? She hit me through the window, one punch. That's funny. Doesn't mention that at all." The prosecutor said Jenkins's testimony was a "bald-faced lie[]."

Jenkins contends these statements constitute misconduct. We disagree.

" 'Improper remarks by a prosecutor can " 'so infect [] the trial with unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1204.) "[A] prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair." (*Ibid*.) Although the prosecutor " 'may

10

vigorously argue his case and is not limited to "Chesterfieldian politeness' " [citations]," excessive appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial, such as directing the jury to view the crime through the eyes of the victim. (*People v. Fields* (1983) 35 Cal.3d 329, 363.)

Here, the prosecutor's reference to the discrepancy between Jenkins's statements on Instagram and her trial testimony constituted fair commentary on the evidence, and beyond a reasonable doubt had no power to excite the jury's sympathy or passions beyond that afforded by the substantive evidence.

## II.    Petition for Writ of Habeas Corpus

In 2006, the Williams sisters, both juveniles, were declared wards of the court due to their having committed three hate-crime assaults with force likely to produce great bodily injury. (*People v. Emerald R.* (Mar. 4, 2010, B196643), Lexis 1567, nonpub. opn.)[1]

Jenkins contends the prosecutor violated her constitutional and statutory rights by failing to disclose this material fact before trial. (See Pen. Code, § 1054.1 [prosecution must disclose all relevant and exculpatory evidence]; *Brady v. Maryland* (1963) 373 U.S. 83, 10 L.Ed.2d 215 (*Brady*) [due process requires prosecution to turn over all material evidence to the defense].) We disagree.

---

[1] The juveniles in *People v. Emerald R.*, *supra*, B196643, are referred to as "Brit. W." and "Sade W.", which Respondent contends fails to establish they were the Williams sisters here. That is a fair point, but for present purposes we will assume Brit. W. and Sade W. were Brittneeh and Sade Williams.

### A. Pertinent Procedural History

During pretrial discovery, the prosecution disclosed that both Brittneeh and Sade had prior criminal records.

The prosecution provided Sade's RAP sheet as follows: "Juvenile arrest-10/31/06 arrest for PC 212.5(c), PC 245(a)(l), PC 422.7(a), PC 242 with Long Beach PD-- no dispo stated or charges filed[;] 12/21/07 arrest for PC 487(B)(3) with Lakewood PD; convicted Pc 487(a) on 02/25/08, case number 8BF00075; 03/07/13 conviction set aside and dismissal granted PC 1203.4."

The prosecutor, Deputy District Attorney Lisa Kassabian, declares in these original habeas proceedings that she was unable to obtain further information regarding the disposition of Sade's 2006 arrest due to the passage of time and the fact that it was adjudicated as a juvenile matter. Kassabian declares that had she learned of any further information, she would have forwarded it to defense counsel.

The prosecution also provided evidence that in 2015 and 2016 Brittneeh had committed battery on Jenkins herself, a matter that was disclosed and explored at trial.

### B. Pertinent Law

"Under *Brady* . . . and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence. The duty extends to evidence known to others acting on the prosecution's behalf, including the police. [Citations.] The duty to disclose 'exists even though there has been no request by the accused.' [Citations.] For *Brady* purposes, evidence is material if it is reasonably probable its disclosure would alter the outcome of trial. [Citations.] [¶] 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the

12

accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709-710 (*Johnson*).)

### C. Analysis

Jenkins contends that had she known about the 2006 adjudications, she would have used them to portray Brittneeh as the aggressor in the fight with Jenkins, and to impeach Sade's credibility.

We will assume solely for purposes of these proceedings that the prosecutor should have disclosed the 2006 adjudications to the defense, a matter that is in no way certain, as nothing suggests the prosecutor had reason to doubt the statement in Sade's rap sheet that there had been no disposition of the matter. We will also assume that had Jenkins known of the 2006 adjudications, she would have been able to get them before the jury, another entirely uncertain matter.

Even given these two assumptions, there is no reasonable probability that disclosure of the 2006 adjudication would have altered the outcome of trial.

As to Brittneeh, the 2006 juvenile adjudication demonstrated not only that she had been violent 12 years earlier. The 2015 and 2016 offenses, of which Jenkins was aware, indicated that Brittneeh had recently been violent *against her*. Moreover, the circumstances of the instant crime, and the video evidence, both showed that Brittneeh was an aggressor here. She chased Jenkins in her car, and was shown on video attacking her at the gas station. The jury thus already knew that Brittneeh had a penchant for violence against Jenkins.

13

Evidence is only material if there is a reasonable probability its admission would alter the trial result. (*Banks v. Dretke* (2004) 540 U.S. 668, 699.) Here, there is no reasonable probability that a jury that knew Brittneeh chased Jenkins in her car, attacked her at the gas station, and had attacked her twice before, yet still convicted Jenkins of manslaughter, would have convicted Jenkins of a lesser offense had they been informed that Brittneeh had assaulted other women 12 years earlier. (See *United States v. Agurs* (1976) 427 U.S. 97, 113-114 [no *Brady* violation where evidence of prior adjudications was largely cumulative of evidence already presented at trial of the victim's violent nature].)

As to Sade, the 2006 juvenile adjudication could have been used only to impeach her testimony. But the only material part of Sade's testimony was to the effect that Jenkins was not acting in self-defense when she stabbed Williams. This fact was corroborated by A.V., who testified Jenkins followed Williams to the bus stop to stab her.

Impeachment evidence is generally material where the witness " ' "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citations]. In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony." ' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1050.) In light of A.V.'s corroboration, it is not reasonably probable that the 2006 juvenile adjudication would have "put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles v. Whitley* (1995) 514 U.S. 419, 435.)

14

## DISPOSITION

The judgment is affirmed, the writ denied, and the order to show cause discharged.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.